Myles M. SPICER, et al., Plaintiffs,

v.

CHICAGO BOARD OPTIONS
EXCHANGE, INC., et al.,
Defendants.

No. 88 C 2139.

United States District Court,
N.D. Illinois, E.D.

Aug. 10, 1993.

1232

Roger Pascal, Paul E. Dengel, Jeanne L. Nowaczewski, Francine Norz Tobin, Schiff Hardin & Waite, Chicago, IL, for defendants.

Stephen B. Diamond, Eugene W. Beeler, Jr., Mary E. Philipps, Beeler Schad & Diamond, Edward T. Joyce, Paul A. Castiglione, James X. Bormes, Joyce & Kubasiak, Herbert Beigel, Leigh R. Lasky, Beigel & Sandler, Ronald L. Futterman, James G. Bradtke, Futterman & Howard, Chicago, IL, Michael D. Hausfeld, Daniel S. Sommers, Cohen Milstein Hausfeld & Toll, Washington, DC, for plaintiffs.

## MEMORANDUM OPINION

WILL, District Judge.

Before us now in this case are all remaining matters: the distribution to the class of the settlement fund, the fee petitions

from class counsel, class counsel's requests for reimbursement of expenses, and the incentive awards requested for the representative plaintiffs. When a common fund is created for the settlement of a class action lawsuit, as in this litigation, the distribution of the fund is controlled by the court, acting as fiduciary for the class members. *Skelton v. General Motors Corp.*, 860 F.2d 250, 252–53 (7th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). The voluminous fee and costs requests submitted by class counsel—from six law firms and representing the work of approximately 40 lawyers, 17 law clerks, 25 paralegals, and others, over the course of more than four years—will be considered first, under the common fund doctrine, which allows us to award fair and reasonable attorneys' fees and reimbursement for expenses reasonably incurred in creating the settlement fund.

We have already granted to class counsel two interim awards of attorneys' fees and expenses in the amounts of $750,000.00 and $1,000,000.00, totalling $1,750,000.00. Class counsel have filed a fee petition requesting $4,396,324.00, which represents 81.7% of their calculated lodestar figure of $5,379,089.00. In addition, class counsel have requested reimbursement for case expenses totalling $1,197,553.77. The initial requests for fees and expenses together total almost 56% of the $10,000,000 settlement. Class counsel have also filed a petition for administrative expenses and fees. Finally, class counsel have filed a supplemental petition for administrative fees and expenses. In the original petition, they requested $232,135.50 in legal fees already incurred, plus an estimated $5,000.00 for remaining legal fees to complete the administration, and $44,746.79 in costs already incurred in administering the claim fund, plus an estimated $1,550.00 for remaining out-of-pocket costs to complete the administration. In their supplemental petition for administrative expenses and fees, however, class counsel request additional costs of $3,499.00, future projected administrative costs of $1,573.00, and additional legal fees of $28,800.00. We assume that the supplemental petition for fees replaces the original request of an estimated additional $5,000.00, to complete the administration of the fund. We further assume that the supplemental petition for costs replaces the original request for an estimated additional $1,550.00, to complete the fund administration.

In sum, the total amount of fees requested by class counsel is $4,657,259.50, including the fees requested in the original and supplemental petitions for administrative fees to complete the administration of the claim fund. The total amount of costs requested by class counsel is $1,253,848.14, including the projected costs to complete the administration of the claim fund. The combined requested fees and expenses total $5,911,107.64, or more than 59% of the settlement. We are also asked to consider at this time the plaintiffs' petition for an incentive award to the representative plaintiffs.

As discussed below, we will grant the plaintiffs' petition for an incentive award to representative plaintiffs Myles M. Spicer, John A. Brittain, and David W. Schut, in the amount of $10,000.00 each, for a total of $30,000.00. Having reviewed and considered carefully the pending petitions, and the accompanying time records, affidavits, supporting memoranda, and other supporting materials, we are now prepared to approve a total fee award in the amount of $2,900,000.00, which represents 29% of the settlement. In addition, we are prepared to approve costs in the amount of $1,002,252.50. These figures include the amounts previously allowed as interim fees and costs awards. Thus, further funds for both fees and costs will be disbursed to class counsel in the total amount of $2,152,252.50. It should be noted that the total award to class counsel, for both fees and costs, is $3,902,252.50, which represents approximately 39% of the settlement. A reserve fund in the amount of $40,000.00, plus all interest earned after July 1, 1993, (which we anticipate to be approximately $30,792.00) shall be established for future contingencies. The remaining settlement fund, including all interest earned through July 1, 1993, shall be distributed to the class as specified below and in our Final Judgment Order, entered June 18, 1993. Any distributed funds unclaimed by class members by December 1, 1993, shall be added to the reserve fund. A separate order is attached.

## I.

### BACKGROUND

This action was brought in the aftermath of the October 19, 1987 "Black Monday" stock market upheaval—a day in which the stock and other equity markets across the United States experienced gross declines without comparison since the stock market crash of 1929. The Dow Jones Industrial Average fell by 508 points—a decline of 22.6 percent from the close of trading on Friday, October 16, to the close of trading on Monday, October 19, 1987. The index for Standard & Poors 500 dropped 57.68 points, or 20.74 percent of its value. The volume of trading on all exchanges soared.

This suit was based specifically on the events which occurred on the floor of the Chicago Board Options Exchange ("CBOE") on October 20, 1987, the day after the vast declines had taken place in the equity markets. The prices for these options on October 19 & 20, 1987, were unusually high at times and unstable throughout the day, at least in part, because of the declines and instability in the equity markets.

The first complaint in this case was filed in March 1988. Two other complaints were filed in the next three months. The plaintiffs' principal theory of liability was premised upon the defendants' failure to disclose certain risks. Defendants included CBOE, the Options Clearing Corporation ("OCC"), and a number of market makers. In June 1988, the first complaint was consolidated with the two other similar complaints. The remainder of 1988 was devoted to sorting out the various claims, including the filing of a consolidated complaint, followed by the first motion to certify the class, class discovery, and the first motions to dismiss. The case accelerated when the second consolidated complaint was filed in March 1989. The balance of 1989 was devoted to class discovery, briefing on certification of the class and the several motions to dismiss, and frequent hearings before the court to clarify the substance and parameters of the claims. The defendants filed surreply memoranda opposing class certification and supporting the motions to dismiss. CBOE also sought a hearing to present testimony on the issue of class certification.

In January 1990, we granted the class certification motion. The class was defined as:

> All persons, other than market makers, who purchased OEX or OEZ series [Standards & Poors 100] index options through market orders during a rotation on October 20, 1987, at the Chicago Board Options Exchange, and who [allegedly] suffered damages from such purchases because of paying excessive prices for those options as a result of defendants' alleged misconduct.

Class Certification Order, entered January 30, 1990. On October 24, 1990, we granted in part and denied in part the defendants' motions to dismiss, dismissing the defendant market makers from the case. Most of 1991 was devoted to discovery. Defendants CBOE's and OCC's motion for summary judgment was filed in early 1992, and expert discovery continued for several months. On December 3, 1992, we granted in part and denied in part the defendants' motion for summary judgment. The defendants' motion for summary judgment was granted with respect to the Securities Act of 1933 § 12(2) claim and denied with respect to the Securities and Exchange Act of 1934 § 10b (and Rule 10b–5) claim generally. Partial summary judgment was also granted on one issue under 10b–5—the risk from the way the rotations were conducted. Preparation for trial continued. On December 22, 1992, the case was resolved by settlement, in the amount of $10,000,000.00.

## II.

### FEE PETITION

A. *Legal Work Performed In This Case*

During the more than four years that this case was pending, class counsel allegedly devoted more than 32,000 hours to create a $10,000,000.00 fund for the benefit of the class members. Two firms—Beeler, Schad & Diamond and Joyce & Kubasiak—assumed lead counsel status in this case in the spring of 1989, when the second consolidated complaint was filed. More than 85% of the time

devoted to this case was spent by these two firms. Beeler, Schad & Diamond devoted 19,700 hours to this case, which comprised approximately 60% of the total time spent by class counsel. Joyce & Kubasiak devoted 8,400 hours to this case, which comprised approximately 26% of the total time spent by class counsel.

1. The Work Performed By Class Counsel

We will briefly review the general work performed by class counsel on behalf of the plaintiffs in this case.

The first complaints in this case were filed in early 1988. Motions to dismiss and to certify the class were briefed in the fall of 1988. Recognizing the force of certain of the defendants' arguments, class counsel decided in late 1988 to reconstitute the case fundamentally. This decision resulted in the filing of the second amended complaint in March 1989. Class counsel argue that they were at a significant disadvantage regarding the prosecution of this case because of their lack of familiarity with the pricing and trading of index options. They note that defendants' counsel had the assistance of CBOE's technical staff, sophisticated computer systems, and a surveillance department experienced in monitoring for rules violations and trading irregularities. Moreover, defendants' counsel had ready access to the individuals who operated the exchange and the OCC.

To compensate for this disadvantage, class counsel employed outside experts, purchased computers, and took extensive discovery through both document examination and depositions in order to formulate their case. Together with the experts, class counsel developed the options pricing models necessary to determine damages in this case. Class counsel not only hired three experts to advise them during the case, but also frequently attended seminars conducted by experts to prepare them for trial. The subjects of these seminars included: options pricing; trading procedures at CBOE; the CBOE constitution, rules, and rule interpretations; interrelationships of markets and hedging; price and volume reporting to the public; other information reported to the public; the audit trail of October 20 OEX options transactions (regarding price, participants, clearing firms,

volume, and time of transactions); net capital requirements of market makers and clearing firms; and the role of the OCC.

From the onset, class counsel attempted to divide the legal work in a way which enabled them to pursue the litigation as efficiently as possible. According to class counsel, they met periodically to generate ideas and assignments, and review work already done, so that no person would duplicate the work of any other person. We note and appreciate the efforts of class counsel to minimize such duplication. However, in a case of this size, with so many lawyers involved, it is virtually impossible to eliminate altogether the duplication of effort. The frequent meetings themselves inevitably represented duplication. Because we feel that significant duplication of effort has occurred in this case, we have taken that fact into account in making our determination of fair and reasonable fees.

As described below in greater detail, Futterman & Howard, in conjunction with Beigel & Sandler, responded to the motions to dismiss the complaint, assisted by Beeler, Schad & Diamond and Joyce & Kubasiak. Beeler, Schad & Diamond and Joyce & Kubasiak handled the class certification issues, class discovery, and briefing. Once the class was certified and the motion to dismiss was denied, class counsel divided the defendants and other parties among the class counsel firms so that discovery would not be extensively duplicated. Upon completion of merits discovery, Beeler, Schad & Diamond took the lead in responding to the motions for summary judgment. It also assumed responsibility for all damage analysis and expert discovery, with the assistance of Joyce & Kubasiak.

Class certification was fought by the defendants for over a year, with detailed discovery and extensive briefing. The defendants filed affidavits supported by exhibits summarizing trading data on October 20, in an attempt to establish that: (1) market makers were buyers as much as sellers and thus public customers did not constitute a class distinct from market makers; and (2) trading in the first and second rotations extended over six hours, with hundreds of series trading at different prices under varying market condi-

tions and interrupted by a trading halt, so that an individual investigation of the price of each series in each rotation would be required, thus destroying commonality.

We held several hearings focusing on whether common issues would predominate. Finally, we certified the class described above. We declined, however, to certify a defendant class until the motions to dismiss were decided. Substantial briefing on the defendant class certification issue occurred during the spring and summer of 1990. Numerous hearings on this issue were held, at which class counsel were questioned regarding the definition of a defendant class of market makers who failed to appear and trade on October 20. This issue was never resolved because we granted the market makers' motions to dismiss.

We held several hearings to define the class. We eventually determined that damages would be calculated based solely on the allegedly excessive prices paid on October 20, without regard to any subsequent or preceding sales or purchases. We then required class members to "net" losses so that any who had benefitted from excessive prices or other recoveries would be required to offset their profits and other recoveries against their losses. We drafted the final draft of the class notice, accepting most of class counsel's proposals. We then required class counsel to send notice to all potential class members. Class counsel found this to be a difficult and time-consuming endeavor, requiring them to construct a class list from scratch since CBOE had no list of individual traders or brokerage firms involved. Unfortunately, fewer than five persons responded to the notice in the *Wall Street Journal.* Class counsel subpoenaed 147 brokerage firms for trading records, and filed motions to compel against several. Class counsel spent several hundred hours enforcing the subpoenas. A protective order was entered in June 1990, requiring that all of the records of the brokerage firms be kept confidential.

Class counsel spent several months preparing a database of all class members, including all relevant trade data. The hard copy data had to be evaluated by class counsel and then put into the database created for this case by the plaintiffs' computer experts. Class notice was sent in July 1990 to approximately 2,800 potential class members. In August and September 1990, notice was sent to an additional 300 potential class members. Beginning in April 1991, class counsel provided us with written status reports concerning efforts to identify class members.

The complaint evolved as the case developed. In response to the defendants' motions to dismiss, class counsel recast the entire complaint. It was their fifth amended complaint, filed in January 1990, that we sustained in significant part in our ruling on the motions to dismiss. We found that a failure to enforce rules would not sustain an implied right of action under the Securities and Exchange Act of 1934, but sustained plaintiffs' principle claims under both section 12(2) and rule 10b–5, essentially leaving the plaintiffs with an omissions and a scheme to defraud case.

Our decision to dismiss the market makers led class counsel to request that we reconsider our ruling. We declined to do so. Class counsel, concerned that there would be a statute of limitations problem against the market makers unless an appeal was undertaken immediately, appealed unsuccessfully to the Seventh Circuit on that issue and whether there should be an implied private right of action for the failure of CBOE to enforce its rules. Class counsel point out that the Seventh Circuit opinion recognizes that a private right of action for violation of an exchange rule might be allowed in certain circumstances. *See Spicer v. Chicago Bd. of Options Exchange, Inc.,* 977 F.2d 255, 256 (7th Cir.1992) ("We decline to announce a categorical rule regarding all potential private actions under this provision [Section 6(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78f (1988) ].").

In February 1991, defendants CBOE and OCC filed their answer to the fifth amended complaint, which admitted none of the central allegations. Discovery began again. Joyce & Kubasiak handled discovery related to the market makers. Beeler, Schad & Diamond was responsible for discovery of CBOE's officers, employees, and investigating committees. Futterman & Howard and

Beigel & Sandler handled discovery from the OCC. Beeler, Schad & Diamond was generally responsible for preparing document requests. It also prepared and served three sets of interrogatories. Beeler, Schad & Diamond maintained a computer-based document depository with an analysis of each document according to predetermined categories. A database was then constructed from which documents could be properly selected for depositions.

In total, class counsel took 76 depositions; interviewed additional witnesses; subpoenaed documents from approximately 40 market makers, 147 introducing brokers, and clearing firms; examined 30,000 pages of documents and millions of trading records. According to class counsel, discovery was particularly time-consuming because of the arcane record-keeping practices of the business. They spent an enormous amount of time preparing for each deposition, with Beeler, Schad & Diamond conducting a computer run of its litigation support database to find deposition references and documents relevant to each witness. It also prepared a package of material as a predicate to each deposition. Class counsel also filed in April 1991, a motion to compel production of documents asserted to be protected by various privileges. In June 1991, we entered an order directing that most of these documents be produced to the plaintiffs. These voluminous documents were produced during the following eight weeks. As a result of the delay in document production, class counsel had to retake many depositions. In November 1991, class counsel served extensive responses to contention interrogatories, including references to deposition testimony and exhibits. Subject to limited exceptions (i.e., expert discovery), discovery closed in November 1991.

Plaintiffs' testifying expert—John Blin— was deposed by the defendants in the spring and summer of 1992. During the course of his deposition, the defendants attempted to disqualify him or drive him from the case by insisting on taking discovery of all of the clients for whom he had served as investment advisor. We prohibited such discovery, granting an appropriate protective order.

Beeler, Schad & Diamond deposed three of the defendants' four trial experts and Joyce & Kubasiak deposed the defendant's remaining expert.

Robert Whaley, the defendants' lead expert, had researched extensively and written widely on index options, options pricing theory, and arbitrage-based pricing models. Whaley attempted to counter Blin's damages opinions by applying different techniques and vantage points to his analysis of OEX trade data. He disputed Blin's linkage and arbitrage theories as they applied to OEX options. He developed his own forecast model—the "naive model"—which formed the basis for his conclusion that plaintiffs' damages were, at most, $2.9 million. Working with their experts, class counsel attempted to chart the complete matrix of possible information needed in order to reproduce Whaley's results and effectively rebut his contentions. This required much time and effort on the part of class counsel.

Another of the defendants' experts—Merton H. Miller—offered opinions designed to frame Whaley's quantitative analysis. Drawing from his extensive experience in this field and his work on the Miller Report, he challenged Blin's parameters regarding the linkage between cash and futures markets, disputed the extent to which the formal arbitrage impacts the fairness and orderliness of derivative markets, and cautioned against application of any hard-and-fast rules to high volatility markets.

Another of the defendants' experts—Mark Rubenstein—also provided additional framework for Whaley's quantitative analysis opinions. He challenged Blin's delinkage opinions and suggested that the OEX options market could still be fair and orderly notwithstanding the absence of arbitrage links between and among CBOE (OEX), Chicago Mercantile Exchange (SPZ), and New York Stock Exchange (S & P 100 cash). He also challenged Blin's damage approach, including the propriety of applying one implied volatility value throughout October 20.

Another of the defendants' experts—Sheldon Natenberg—offered opinions designed to link Whaley's quantitative analysis and apply both Rubenstein's and Miller's theoretical

analysis in practical terms to the actual events which occurred on October 20, as viewed from the exchange floor. He offered opinions regarding the propriety of operational decisions made by CBOE on the exchange floor on October 20, including CBOE's decisions to open, to waive the bid-ask spread, and to conduct rotations. According to class counsel, these experts made it imperative that class counsel devote hundreds of hours to the preparation of depositions.

Although both the Brady Commission Report and the SEC Staff Report were helpful to class counsel in the prosecution of this case, neither provided the level of detail necessary to establish liability and damages at trial. Through their discovery in this case, class counsel discovered alleged price and volume reporting inadequacies at the CBOE, none of which was mentioned in any of the reports. They also discovered the details regarding the reports by CBOE's Market Review Panel and Special Business Conduct Committee, none of which was made public. Class counsel determined that many of the conclusions in the SEC Staff Report and the Brady Commission Report were too simplistic for proper use at trial and found it necessary to develop their own theories and analyses.

Upon receipt in July 1989 of CBOE's various computer trade files for October 20 OEX trades, class counsel began an intensive examination of all OEX trades at CBOE on October 20. Because this occurred prior to certification of the plaintiff class, class counsel could not depose CBOE's computer personnel to answer their questions concerning this data. Plaintiffs' experts struggled to develop a series of computer analyses to determine when each trade occurred. After class counsel exposed the alleged deficiencies in CBOE's audit trail, they still had to fix the times of all trades with reasonable accuracy in order to analyze the fairness of the prices of each series. In order to analyze the fairness of any series, it was crucial for class counsel to determine the time that each series traded at a given price. The price of each series had to be measured against the bid-ask of that series, the level of the under-

lying instrument, and the level of the hedge. With this information, class counsel were able to analyze the fairness of any OEX option price using an arbitrage-based pricing model, such as Black–Scholes or Cox–Ross–Rubinstein. They could also analyze the relationships of prices between series and pricing patterns among series.

The task of analyzing October 20 trading was enormously complex. In fact, although various attempts had been reported in academic literature to analyze phenomena for other days during the October 12–23, 1987 crash period, no published author attempted analysis of October 20. Class counsel essentially reconstructed a sense of order that public customers could reasonably have expected to occur on an admittedly volatile October 20. To accomplish this feat, they analyzed the trades for many other trading days over the preceding 16 months. By July 1991, class counsel had upgraded their computer system to enable them to receive straight main frame dumps—that is, data transfers eliminating the need for CBOE to engage in programming or other alterations of its main frame computer data files. Plaintiffs received this requested data in October 1991. In analyzing the trading data for the preceding 16 months, class counsel searched for other trading days experiencing high volatility, examined the data for reporting accuracy and pricing patterns, and measured hedging and arbitrage activity in other markets. Class counsel identified non-volatile trading days and compared findings on volatile days with comparable analysis for non-volatile trading days' results.

Class counsel were able to apply the principles of econometrics to sample and structure the performance of this market in a way to measure the volatility of the OEX market, reasonably restore order to October 20, and account for the alleged unfairness built into many series that were traded on that day. Class counsel's efforts and results were contained in Blin's Fed.R.Civ.Proc. 26 Summary prepared in February 1992, and in his implied voluntary report forwarded in May 1991.

The defendants filed a summary judgment motion in February 1992. Class counsel re-

sponded with a lengthy memorandum, including the affidavit of Blin, 36 supporting exhibits, and several appendices. After the defendants' reply, a surreply was filed by class counsel in September 1992. We issued our opinion on the summary judgment motions in early December 1992. Shortly before the summary judgment motions were decided, the defendants filed five motions *in limine*, which remained unresolved at the time the case finally settled. The defendants also filed a motion to decertify or narrow the plaintiff class. The defendants also filed a motion for bifurcation, which we granted. In late November 1992, the defendants filed a motion to postpone the trial until at least March 1993, which we denied. An absolute trial date of January 4, 1993 was set.

In their petition, class counsel point out that the defendants have not yet made any changes in the Options Disclosure Document ("ODD"). However, they argue that the summary judgment opinion is itself prophylactic relief in that it acknowledges at least the possibility of a number of deficiencies in the ODD. Class counsel further argue that there is prophylactic relief resulting from this case in the sense that CBOE and OCC must either amend their operations or await the next lawsuit against them on the groundwork that has been laid by class counsel.

2. Work Performed By Each Firm

We will briefly review the role of each firm and its most active attorneys in the litigation of this case.

a. *Beeler, Schad & Diamond, P.C.*

Beeler, Schad & Diamond acted as the resource center for all firms involved in this case. It obtained documents from the defendants, analyzed, catalogued, and made available these documents to co-counsel. Beeler, Schad & Diamond maintained the deposition exhibits, providing copies and lists to all firms. Partner Stephen B. Diamond performed three principal functions on behalf of the class. First, along with partner Edward Joyce of Joyce & Kubasiak, he acted as principal spokesperson on behalf of the class. Second, he prepared the agenda for and presided at every meeting of class counsel, assigned work, and followed up to ensure that all work was completed. After the motions

to dismiss were briefed, Diamond wrote most memoranda and motions that were filed with the court. Third, he took the depositions of the senior officers of the CBOE, every exchange officer or employee involved in trading on October 20, including floor officials, order book official's price and quote reporters, communications vice presidents, and others. In addition, Diamond assumed the lead role for trial preparation. The pretrial order was prepared under his supervision.

Partner Eugene W. Beeler, Jr. performed four principal functions on behalf of the class. First, he analyzed CBOE's computerized trade data systems, analyzed the features and deficiencies of CBOE's trade audit trail, and deposed CBOE's computer systems personnel involved in CBOE's internal post-October 20 investigations. Second, he coordinated work and provided resources needed for plaintiffs' consulting and trial experts. He helped them design programs to analyze the effects of exchange actions and system irregularities on those prices. He also headed plaintiffs' efforts to assign times for all October 20 trades, and analyzed CBOE's computer trade data for rules violations. Third, he designed class counsel's document and deposition litigation support databases and instructed both staff and class counsel in its use. He also designed the computer system and selected equipment to incorporate and analyze 16 months of CBOE OEX options trade data. Fourth, he had overall responsibility for expert discovery. He prepared the plaintiffs' Fed.R.Civ.Proc. 26 Summary, analyzed Fed.R.Civ.Proc. 26 summaries of and deposed CBOE's three trial damages experts. He defended against the defendants' motion to bar plaintiffs' expert, and prepared for trial direct examination of the plaintiffs' expert, and cross-examination of the defendants' trial damages experts. He also identified and developed the plaintiffs' "comparable market" rebuttal analysis.

Beeler also analyzed the market maker liability issues, helped identify potential defendant class members, and provided much of the research and many of the arguments supporting the duty of market makers to appear and trade. He prepared merits document requests and interrogatory sets, partic-

ipated in numerous Rule 12(k) conferences, and helped depose CBOE's floor procedures expert. He supervised the subpoenaing of clearing firm trading records and prepared sections of plaintiffs' responses to various motions.

Beginning in 1990, associate Mary E. Phillips bore principal responsibility for the identification and notification of the plaintiff class, including conducting third party discovery from 147 brokerage firms, negotiating with those firms for the production of customer trading data, and supervising the process of putting class member identity and trading data into a database, and mailing class notices to all potential class members. She was primarily responsible for implementing the document litigation support database designed by Beeler. She prepared pretrial order materials, and designed demonstrative exhibits and a case law research database for use during trial. Phillips also conducted extensive legal and factual research and drafted responses and motions, including analyzing documents produced by CBOE and government reports, researching and drafting a motion to compel CBOE and OCC to produce privileged documents, researching factual issues in documents produced by CBOE and various government reports in order to produce a comprehensive response to defendants' interrogatories, researching and drafting legal arguments related to plaintiffs' responses to the summary judgment motions, analyzing documents produced by CBOE and deposition testimony for support of factual assertions made in the responses, and conducting research in academic and securities industry periodicals regarding pre-crash descriptions of market delinkage phenomena to support the testimony of plaintiffs' expert.

Associate Vincent J. Buzek conducted an extensive interview poll of class members to determine individual data on plaintiff class trading strategies and the events that occurred on October 20, 1987. Additionally, he conducted legal and factual research in support of plaintiffs' claims and assisted Phillips in analyzing documents produced by CBOE for entry into a litigation support database. Among other things, he subpoenaed clearing firms for the production of documents related to their capital situations and conducted depositions of many clearing firm representatives.

The paralegals at Beeler, Schad & Diamond implemented and utilized the document and litigation support databases maintained by the firm for the benefit of all class counsel. They completed all computations and prepared the graphs attached to expert Blin's Rule 26 Interrogatory response and also the subsequent revisions of those and other graphs. They also assisted in the third party discovery of brokerage firms to ascertain identities of individual class members and maintained the database containing customer trading data. They handled questions from class members, located missing class members, abstracted depositions, and prepared demonstrative exhibits.

Beeler, Schad & Diamond has also requested fees for clerical time spent on this case. The firm's clerical time is divided into two parts. First, substantial clerical time was devoted by assistants to paralegals which was billed at a rate less than 50% of the paralegal rate. The assistants to the paralegals input database information, organized documents, and performed various other tasks. Also, whenever paralegal work could have been accomplished by clerical staff, class counsel have reduced the rates of those paralegals to the clerical rate. Second, the firm did not charge secretarial overtime rates, but instead charged at the standard hourly clerical rate, despite the fact that the firm's clerical staff spent considerable overtime during the life of this suit.

We now summarize the fee request presented by Beeler, Schad & Diamond. Beeler, who is billed at an hourly rate of $275.00, spent 4,592.60 hours on this case, for a lodestar of $1,262,965.00. Diamond, who is billed at an hourly rate of $275.00, spent 2,667.10 hours on this case, for a lodestar of $733,-452.50. Partner Lawrence W. Schad, who is billed at an hourly rate of $240.00, spent 197.30 hours on this case, for a lodestar of $47,352.00. Philipps, who is billed at an hourly rate of $120.00, spent 3,875.60 hours on this case, for a lodestar of $465,072.00. Buzek, who is billed at an hourly rate of $120.00, spent 1,407.50 hours on this case, for

a lodestar of $168,900.00. Other associates, billed at hourly rates ranging from $140.00 to $150.00, spent 540.15 hours on this case for a lodestar of $78,417.00. Paralegals, billed at hourly rates ranging from $65.00 to $70.00, spent 4,340.53 hours on this case, for a lodestar of $284,743.45. Paralegals, billed at the clerical hourly rate of $30.00, spent 229.20 hours on this case, for a lodestar of $6,876.00. Clericals, billed at an hourly rate of $30.00, spent 1,686.10 hours on this case, for a lodestar of $50,583.00. The firm lodestar totals $3,098,360.95, for 19,536.08 hours spent on this case.

### b. *Joyce & Kubasiak, P.C.*

Joyce & Kubasiak conducted factual and legal research relating to the various causes of actions alleged against CBOE, OCC, and several participating and non-participating market makers. It also assisted in the drafting of each complaint. It participated in the briefing of all significant motions in the case, including responses to the motions to dismiss and briefs regarding the motions to certify both the defendant and plaintiff classes. Prior to the certification of the plaintiff class, the firm also participated in class discovery, including written discovery and depositions of class representatives. In support of the plaintiffs' motion to compel, the firm assisted in briefing the issue whether the self-evaluative privilege applied to investigations undertaken by CBOE and OCC after October 20. During the market maker depositions, it briefed the issue whether the attorney-client privilege limited the scope of discovery pertaining to the submissions of several market makers to the Special Business Conduct Committee ("SBCC") of the CBOE. The firm participated in preparing responses to the defendants' motions for summary judgment. Also, the firm researched a number of issues relating to the admissibility at trial of certain documents, including the Brady Report and the 1987 SEC Report. Joyce & Kubasiak also prepared motions in limine with respect to evidence which the defendants planned to introduce at trial.

The firm conducted nearly all of the discovery relating to market maker conduct in the days prior to and on October 20. It subpoenaed and deposed approximately 40 market makers and floor brokers, including both participants and non-participants on October 20. The firm also participated in the preparation of discovery to the defendants. It also hired and prepared a former market maker—James Harrigan—to offer expert testimony regarding the general operation of the OEX pit and the role of the market makers. The firm spent considerable time assisting in the preparation of the plaintiffs' primary liability and damage expert—John Blin. It also assisted in the preparation of the plaintiffs' appellate brief on the issue whether an implied private cause of action could be brought for violations of CBOE's rules and conferred with co-counsel throughout the litigation to determine pre-trial and trial strategy. The firm took the deposition of at least one of the defendants' experts and assisted substantially in the defense of the defendants' deposition of Blin.

Together with Beeler, partner Edward T. Joyce developed in conjunction with expert Blin the "linkage" argument which was the linchpin of Blin's opinion. Joyce was responsible for developing the argument that the defendants misrepresented the market makers' duty, or at least failed to disclose to the public that the market makers had no duty to appear and make a market on any given day. In conjunction with Diamond, Joyce developed many of the Section 12(2) and 10b–5 omissions arguments. Also, Joyce was responsible for convincing Blin not to withdraw from the case, following the defendants' attack on his opinion. Joyce was responsible for most of the market maker depositions. From his deposition of First Options, he developed the argument that CBOE and OCC were motivated to permit the wholesale violation of their rules by the market makers because of a concern relating to the ability of the clearing firms to meet their financial obligations to the defendants if October 20 proved to be as disastrous as the previous day.

Together with Joyce, associates Paul A. Castiglione and James X. Bormes had four primary areas of involvement. First, they conducted factual and legal research, drafting the complaints and briefing the numerous motions in this matter, including plaintiffs'

motions to certify and plaintiffs' response to the defendants' motion for summary judgment. Second, they were involved in all stages of discovery, including expert discovery, related to market maker activity. Third, they assisted in preparing the final pre-trial order and other trial preparation. Fourth, they were responsible for other miscellaneous matters, including preparation of the appellate brief with respect to interlocutory appeal of dismissal of claims for CBOE rules violations and coordination with co-counsel on general litigation strategy.

We now summarize the fee request presented by Joyce & Kubasiak. Joyce, who is billed at an hourly rate of $275.00, spent 2,723.50 hours on this case, for a lodestar of $748,962.50. Partner John T. Doyle, who is billed at an hourly rate of $200.00, spent 48.60 hours on this case, for a lodestar of $9,720.00. Partner Raymond A. Flystra, who is billed at an hourly rate of $200.00, spent 9.30 hours on this case, for a lodestar of $1,860.00. Partner Steven J. Rotunno, who is billed at an hourly rate of $200.00, spent 10 hours on this case, for a lodestar of $2,000.00. Associate Paul A. Castiglione, who is billed at an hourly rate of $150.00, spent 2,756.80 hours on this case, for a lodestar of $413,-520.00. Associate James X. Bormes, who is billed at an hourly rate of $140.00, spent 1,933.10 hours on this case, for a lodestar of $270,634.00. Law clerks, billed at hourly rates ranging from $50.00 to $85.00, spent 682.50 hours on this case, for a lodestar of 43,921.50. Paralegals, billed at an hourly rate of $65.00, spent 198.10 hours on this case, for a lodestar of $12,876.50. The firm lodestar totals $1,503,494.50, for 8,361.90 hours spent on this case.

### c. *Futterman & Howard, Chtd.*

After drafting the initial complaint on behalf of Brittain, Futterman & Howard had primary responsibility for portions of the brief in opposition to the motions to dismiss. It also had significant involvement in discovery. It took the lead in examining the in-house counsel for CBOE and for OCC and had primary responsibility for the discovery taken from the OCC. The firm also sought out and interviewed prospective expert witnesses in the case and participated in the development of the plaintiffs' damage theory. The firm shared responsibility for the preparation of legal and factual arguments in plaintiffs' submissions in opposition to the defendants' motion for summary judgment.

Partner Ronald L. Futterman was involved in all phases of the litigation. After drafting the complaint for plaintiff Brittain, he was involved in the initial preparation of discovery requests and conferences with defendants' counsel to resolve objections. He also supervised the work of junior partner James G. Bradtke, who during 1988 and 1989 was extensively involved in the case. Futterman participated in the preparation of the various amendments to the complaint and supervised the research efforts raised by the defendants' motions to dismiss. Following preparation of sections of the brief in opposition to the motions to dismiss for which the firm was responsible, Futterman reviewed and edited those drafts. He was also involved in the effort to locate an expert witness for the plaintiffs, which was particularly time-consuming because of the reluctance of many academics, who valued their relationship with the CBOE or other securities exchanges, to become involved as a testifying expert for the plaintiffs. Futterman was also responsible for developing the arguments advanced in support of class certification concerning the absence of material fact disclosures in the Options Disclosure Document. He had the responsibility for taking the depositions of in-house counsel at both CBOE and OCC. He also developed the factual case against OCC, which required his examination of thousands of pages of documents. He was responsible for taking the depositions of the executive vice president of OCC, and the president and chairman of OCC. He provided input into the development of the responses to the contention interrogatories, and also with respect to the development of the damage theory. Futterman also assembled the factual information in the record to rebut OCC's claim that it was entitled to summary judgment. He was assigned the task of preparing for and taking the deposition of at least one of the defendants' experts. He spent considerable time reviewing articles and SEC materials, including testimony of the defendants' experts before congressional committees.

During 1988 and 1989, partner James G. Bradtke had primary responsibility for the work performed by Futterman & Howard on this case. He was initially involved in researching and writing the arguments advanced by the plaintiffs in support of their claim that a private right of action existed under Section 6 of the Securities and Exchange Act of 1934 for violation of CBOE rules. He was also involved in the early review of documents and participated in the research and writing of sections of the class action brief. In mid–1990, Bradtke was required to reduce his active work schedule for health reasons. Upon his return to work on a part-time basis in 1992, the case was too well developed for him to become involved again without significant duplication of effort. Accordingly, from January 1991 through the present, Bradtke was essentially uninvolved in the case, and Futterman took on primary responsibility for the case at the firm.

Two senior paralegals devoted approximately 30% of the total hours invested by this firm in the case. Their work involved primarily extensive library research. Working under the close supervision of class counsel and the consulting experts, the paralegals located articles in business periodicals and academic journals which concerned options pricing models and recent theoretical developments that modified the traditional approach to options pricing models. Their work required them to identify these articles and to contact university libraries around the country to obtain monographs prepared by the authors or works in progress.

We now summarize the fee request presented by Futterman & Howard. Futterman, who is billed at an hourly rate of $275.00, spent 1,019.30 hours on this case, for a lodestar of $280,307.50. Bradtke, who is billed at an hourly rate of $200.00, spent 315.80 hours on this case, for a lodestar of $63,160.00. Partner Aram Harturian, who is billed at an hourly rate of $240.00, spent 1.60 hours on this case, for a lodestar of $384.00. Associates, billed at hourly rates of $150.00 and $160.00, spent 23.10 hours on this case, for a lodestar of $3,498.00. Law clerks, billed at an hourly rate of $50.00, spent 111.55 hours on this case, for a lodestar of $5,577.50. Paralegals, billed at an hourly rate of $70.00, spent 388.30 hours on this case, for a lodestar of $27,181.00. Paralegals, billed at the clerical hourly rate of $30.00, spent 16.00 hours on this case, for a lodestar of $480.00. The firm lodestar totals $380,588.00, for 1,875.65 hours spent on this case.

#### d. *Beigel & Sandler, Ltd.*

Partners Herbert Beigel, Leigh Lasky, and Philip Fertik of Beigel & Sandler had principal responsibility for the firm's involvement in this case. The four primary areas of involvement for Beigel & Sandler were: (1) conducting factual and legal research in connection with the original complaint filed against CBOE and OCC; (2) drafting the original motion for class certification and participation in the joint responses to motions to dismiss filed by the defendants; (3) handling the appeal to the Seventh Circuit from our memorandum opinion of October 24, 1990, including both briefs and oral argument; and (4) assisting co-counsel in connection with certain discovery matters including discovery related to the OCC.

In response to the various complaints, the defendants filed motions to dismiss. Beigel & Sandler participated in the coordinated opposition to the various motions to dismiss the plaintiffs' complaints. The firm also participated in the research on the issues raised by the defendants' motion to dismiss. It drafted certain sections of the plaintiffs' responses to the motions for summary judgment and generally provided input in connection with these responses. The firm had the principal responsibility for the appeal, which focused on whether an implied right of action exists under Section 6 of the Securities and Exchange Act of 1934 for violations of the rules of a national securities exchange by the exchange or its members. Beigel & Sandler participated in class discovery, including defending depositions of class representatives, as well as participating in the other discovery related to class certification. Additionally, the firm coordinated with co-counsel on general discovery and, specifically, discovery related to the OCC.

We now summarize the fee request presented by Beigel & Sandler. Beigel, who is

billed at an hourly rate of $275.00, spent 128.00 hours on this case, for a lodestar of $35,200.00. Lasky, who is billed at an hourly rate of $200.00, spent 747.25 hours on this case, for a lodestar of $149,450.00. Fertik, who is billed at an hourly rate of $200.00, spent 116.75 hours on this case, for a lodestar of $23,350.00. Partner Robert McCoy, who is billed at an hourly rate of $200.00, spent 75.75 hours on this case, for a lodestar of $15,150.00. Partner Stephen D. Sharp, who is billed at an hourly rate of $200.00, spent 4.25 hours on this case, for a lodestar of $850.00. Partner Bruce Rose, who is billed at an hourly rate of $200.00, spent 46.00 hours on this case, for a lodestar of $9,200.00. Counsel Allan Lasky, who is billed at an hourly rate of $240.00, spent 4.00 hours on this case, for a lodestar of $960.00. Associates, billed at hourly rates of $150.00 and $110.00, spent 228.60 hours on this case, for a lodestar of $29,346.00. A law clerk, billed at an hourly rate of $70.00, spent 9.25 hours on this case, for a lodestar of $647.50. Paralegals, billed at hourly rates of $50.00 and $70.00, spent 50.75 hours on this case, for a lodestar of $2,782.50. The firm lodestar totals $266,936.00, for 1,410.60 hours spent on this case.

### e. Cohen, Milstein, Hausfeld & Toll

Cohen, Milstein, Hausfeld & Toll ("Cohen, Milstein") participated primarily in the drafting of the various complaints. It also conducted legal research at the SEC library in Washington, D.C., and engaged in other Washington-area research to obtain information concerning the October 1987 crash from various government sources. It also assisted in the drafting of certain sections of the briefs in opposition to the defendants' motions to dismiss, and defended the first deposition of Brittain. Cohen, Milstein also developed some of the legal arguments in the brief in opposition to the defendants' motion for summary judgment, and assisted Futterman & Howard in the preparation of jury instructions.

We now summarize the fee request presented by Cohen, Milstein. Partner Herbert E. Milstein, who is billed at an hourly rate of $240.00, spent 4.00 hours on this case, for a lodestar of $960.00. Partner Michael D.

Hausfeld, who is billed at an hourly rate of $240.00, spent 73.00 hours on this case, for a lodestar of $17,520.00. Partner Steven J. Toll, who is billed at an hourly rate of $240.00, spent 72.50 hours on this case, for a lodestar of $17,400.00. Partner Daniel S. Sommers, who is billed at an hourly rate of $160.00, spent 243.00 hours on this case, for a lodestar of $38,960.00. An associate, billed at an hourly rate of $100.00, spent 42.00 hours on this case, for a lodestar of $4,200.00. Law clerks, billed at an hourly rate of $50.00, spent 79.00 hours on this case, for a lodestar of $3,950.00. A paralegal, billed at an hourly rate of $65.00, spent 7.50 hours on this case, for a lodestar of $487.50. The firm lodestar totals $83,477.50, for 521.50 hours spent on this case.

### f. Fishman & Merrick

Counsel at Fishman & Merrick were the initial counsel of Buys–MacGregor, one of the class representatives. Having extensive securities and commodities trading experience, the firm prepared the initial complaint filed on behalf of Buys–MacGregor and participated in the initial discovery related to that case. In September 1989, the firm withdrew from further representation when they decided with co-counsel that Fishman & Merrick's representation in arbitration proceedings of market makers, who were neither individual defendants nor members of the potential defendant class, could create the appearance of a conflict of interest. The firm's withdrawal in no way reduces the significance of their early contribution to this case and they remain entitled to compensation.

We now summarize the fee request presented by Fishman & Merrick. Partner David A. Gennelly, who is billed at an hourly rate of $200.00, spent 106.25 hours on this case, for a lodestar of $21,250.00. Partner Kenneth F. Berg, who is billed at an hourly rate of $170.00, spent 77.00 hours on this case, for a lodestar of $13,090.00. Partner Paul Carrier, who is billed at an hourly rate of $200.00, spent 28.70 hours on this case, for a lodestar of $5,740.00. Partner Gerald L. Fishman, who is billed at an hourly rate of $240.00, spent 5.75 hours on this case, for a lodestar of $1,380.00. Associates, billed at hourly rates of $160.00 and $170.00, spent

26.00 hours on this case, for a lodestar of $4,367.50. A paralegal, billed at an hourly rate of $60.00, spent 6.75 hours on this case, for a lodestar of $405.00. The firm lodestar totals $46,232.50, for 250.45 hours spent on this case.

### B. *Administrative Work Performed*

As noted above, class counsel have also submitted two petitions for administrative expenses and fees, to be decided at the same time that we resolve all remaining matters in this case. All of the administrative work was performed by Beeler, Schad & Diamond. They request that they be granted a significant percentage of their attorney time devoted to this administration.

In their original petition for administrative fees and expenses, class counsel requested $232,135.50, plus an estimated $5,000.00 in additional future fees to cover the cost of completing the administration of the fund. However, in their supplemental petition for administrative expenses and fees, filed in mid-July 1993, class counsel inform the court that they have actually incurred additional legal fees of $28,800.00. Accordingly, in their original and supplemental petitions for administrative fees, Beeler, Schad & Diamond requests additional fees totalling $260,935.50.

We will briefly review the administrative efforts performed by class counsel. We preliminarily approved the settlement agreement on December 22, 1992. Notice of the proposed settlement was mailed by December 28, 1992, and a proof of mailing was filed with the court on January 4, 1993. In administering the fund, class counsel engaged in discussions with the court regarding the transfer and investment of the settlement fund. With our approval, the $10,000,000.00 settlement fund was invested at the maximum rate of interest in United States government securities.

As claim forms were received from potential class members, class counsel cross-checked the claimants' data against the supporting documentation in order to verify that the claim forms were properly executed. Where appropriate, class counsel contacted class members to request additional supporting documentation. The fairness hearing was held on January 28, 1993. Following discussion among class counsel, defendants' counsel, and the court, we entered a Final Judgment and Order of Dismissal with Prejudice on February 4, 1993. Because many brokerage firms had failed to provide the necessary supporting trade documentation, including the names of persons who traded on October 20, 1987, we entered an order on February 1, 1993, directing each brokerage firm to respond to class counsel. Class counsel received and processed these responses.

Class counsel's initial report on March 22, 1993, reflected that 887 claim forms had been received and were being processed. On April 15, 1993, we approved the claim determination procedure proposed by class counsel and entered an order which was sent to all claimants, giving them until May 31, 1993, to appeal their claim determination. On May 10, 1993, class counsel filed a claim determination status report, including a four-volume appendix of claim determination calculations. Class counsel provided verification to all claimants who disagreed with their claim determinations. We held a hearing on June 10, 1993, at which we considered the objections of 36 claimants and class counsel's response to each objection, which was contained in a three-volume appendix filed with the court on June 7, 1993. Class counsel have complied promptly with our recent orders regarding the clarification and revision of claim determinations for class members who filed written objections with the court.

We now summarize Beeler, Schad & Diamond's original request for administrative fees. Beeler, who is billed at an hourly rate of $275.00, spent 498.70 hours on administrative matters, for a lodestar of $137,142.50. Diamond, who is billed at an hourly rate of $275.00, spent 88.80 hours on administrative matters, for a lodestar of $24,420.00. Partner James Shedden, who is billed at an hourly rate of $180.00, spent .70 hours on administrative matters, for a lodestar of $126.00. Associates, billed at hourly rates of $120.00 and $150.00, spent 188.00 hours on administrative matters, for a lodestar of $22,569.00. Paralegals, billed at an hourly rate of $65.00, spent 693.80 hours on administrative matters, for a lodestar of $45,097.00. Clericals, billed

at an hourly rate of $30.00, spent 92.70 hours on administrative matters, for a lodestar of $2,781.00. The firm lodestar totals $232,-135.50, for 1,562.70 hours spent on administrative matters. As is apparent, the bulk of the administrative work was performed by partners who seek compensation at their full hourly rates.

In the supplemental petition for administrative fees and expenses, Beeler, Schad & Diamond requests additional fees in the amount of $28,800.00. These fees were incurred in the claims administration principally by performing additional computer database analyses, preparing attorney responses to objecting claimants, and carrying out our further instructions regarding claim administration. We now summarize Beeler, Schad & Diamond's supplemental petition for attorneys' fees. Partner Beeler, who is billed at an hourly rate of $275.00, spent 71.30 additional hours, for a lodestar of $19,607.50. Partner Diamond, who is billed at an hourly rate of $275.00, spent 4.9 additional hours, for a lodestar of $1,347.50. Associate Philipps, who is billed at an hourly rate of $120.00, spent 22.5 additional hours, for a lodestar of $2,700.00. Paralegal Krejci, who is billed at an hourly rate of $65.00, spent 78 additional hours, for a lodestar of $5,070.00. Clericals Finlon and Murphy, who are billed at an hourly rate of $30.00, spent 2.5 additional hours, for a lodestar of $75.00. The firm lodestar for additional hours spent on administrative matters thus totals $28,800.00, representing 179.20 additional hours of legal work. Again, the bulk ($21,000 of $28,000) is administrative work performed by partners. Adding the $28,800.00 additional legal fees requested in the supplemental petition, the total request for administrative fees is $260,-935.50.

The costs of the administration of the settlement fund may be paid from the settlement fund, within the discretion of the court. 2 Newberg on Class Actions § 11.39, at p. 448, n. 180 (3d ed. 1992). Accordingly, we will consider these fees as part of the Beeler, Schad & Diamond fee request.

c. *Summary of the Fees Requested*

1. Standard Reductions

Guided by our opinion in *In the Matter of Superior Beverage/Glass Container*, 133 F.R.D. 119, 130 (N.D.Ill.1990), we are pleased to note that lead counsel (Beeler and Diamond) personally reviewed every time entry of every lawyer, paralegal, and law clerk of every firm, in an effort to make appropriate reductions in the lodestar for each firm. We have also reviewed the time records for the legal and administrative work performed in this case.

A review of the time records indicates that there were frequent conferences held among the counsel in this case. Class counsel suggest that due to the size and complexity of the legal and factual issues in this litigation, and the large number of counsel and experts involved, it was often necessary for class counsel to meet as a group to analyze outstanding problems, resolve those problems, make work assignments, and develop litigation strategy. Some conferences were obviously necessary in order to minimize the duplication of effort—especially where the plaintiffs' experts could quickly bring class counsel up to speed on various substantive issues. Nonetheless, after reviewing the records, we feel that the number of conferences is excessive. We have taken this fact into consideration in making our final determination of what constitutes a fair and reasonable fee.

■ In *Superior Beverage/Glass Container*, we reviewed time entries to correct them where partners did work that could have been done by associates, and where associates did work that could have been done by paralegals, etc. Unlike most other fee petitions we have considered, in this case, the number of partner hours is significantly greater than that of associates. Partner hours expended in this case total 13,317.80. Associate hours expended total 10,832.85. Indeed, as class counsel note, this is extraordinary. Class counsel argue that it is explained by the fact that this case was simply too complicated to have a large part of the case delegated to associates. While we recognize that this case was complex, we disagree with the proposition that the legal issues involved were so complex that further delegation of work to associates, or even

paralegals, was not possible. This is particularly true of the administrative work. We have great confidence in the ability of young lawyers to assimilate complicated factual scenarios, educate themselves regarding the applicable law, and then apply the law to the relevant facts. While we understand that much work must necessarily be done by partners, in large part supervising and reviewing the work of associates and paralegals, we expect delegation of work to associates and paralegals wherever possible. Accordingly, we find the hours expended by partners in this case to be excessive. We also have taken this fact into consideration in making our final fee determination.

 Lead counsel, in preparing the fee petition, struck all associate time appearing at status calls or arguments before the court. We approve of this practice, as we recall very little significant involvement of any associates at the numerous status hearings in this case.

 Where more than eight hours were recorded on any day by any one person, lead counsel examined the entries with extreme care to ensure that no excess hours were billed. We also approve of this practice. In *Superior Beverage/Glass Container,* we struck paralegal time which we believed should have been clerical, and thus part of firm overhead. Class counsel contend that this is an extreme remedy and have instead reviewed paralegal work, and where appropriate, reduced the time and rate from paralegal to clerical for paralegal time spent on what could be considered clerical assignments. Finally, class counsel have excluded from the fee petition all hours billed for time spent preparing the petition. Class counsel have also excluded from the administrative fee petition all hours billed for time spent preparing the petition. We agree. As we have noted in our past opinions determining fee awards, we do not feel that it is appropriate to compensate attorneys for the time spent preparing the fee petition and supporting documentation.

### 2. Calculation of the Requested Fee

 In calculating the lodestar for each firm, the five lawyers who performed the

lead counsel role were assigned the maximum hourly rate of $275.00. Class counsel claim that this rate is somewhat below the hourly rate normally charged by attorneys for work such as that performed in this case.. Senior partners, attorneys with at least 15 years of experience practicing law, who did not serve as lead counsel were billed at an hourly rate of $240.00. All other partners were assigned an hourly rate of $200.00. All associates were assigned hourly rates ranging from $170.00 (for senior associates) to $100.00 (for attorneys admitted to practice in 1991 or 1992). Law clerks who had already graduated from law school were billed at an hourly rate of $85.00. Law student clerks were billed at an hourly rate of $50.00. Senior paralegals were billed at an hourly rate of $70.00. Junior paralegals were billed at an hourly rate of $65.00. Class counsel contend that these rates are conservative. We have received in confidence and reviewed defense counsel's hourly rates in this case. Based on that review, while we do not agree with class counsel that the hourly rates used to calculate the lodestar are conservative, we acknowledge that they are reasonable.

The hours billed in this case (including the hours billed for administrative work) are enormous, totalling approximately 32,625.31. As we have noted above, the prosecution of this case involved significant duplication of effort. Where so many lawyers are involved, such duplication is nearly impossible to eliminate altogether. Nonetheless, it is our obligation to ensure that such duplication is not compensated through our award of attorneys' fees. Accordingly, we have taken this fact into consideration in making our fee determination.

Class counsel have requested the following fees for work performed through the settlement date of December 22, 1992:

| Firm | Lodestar | Amount Requested |
|---|---|---|
| Beeler, Schad & Diamond | $3,098,360 | $2,532,289 |
| Joyce & Kubasiak | 1,503,494 | 1,228,805 |
| Beigel & Sandler | 266,936 | 218,166 |
| Futterman & Howard | 380,588 | 311,054 |
| Cohen, Milstein | 83,477 | 68,225 |
| Fishman & Merrick | 46,232 | 37,785 |
| TOTAL | $5,379,089 | $4,396,324 |

The amount requested by each firm represents 81.7% of their lodestar. Although they contend that a multiplier of between 2 and 3 would be appropriate for the risk involved in this case, class counsel have not requested a multiplier. Even had they requested a multiplier, we would not allow one in this case.

Class counsel's method for calculating the fees requested is straightforward: From the $10,000,000.00 settlement fund, class counsel subtracted the disbursements and divided the remaining amount equally between class members and class counsel. In addition, Beeler, Schad & Diamond has requested $260,935.50 for administrative fees; this additional amount increases Beeler, Schad & Diamond's total fee request to $2,793,224.50. The total class counsel request for fees, including administrative fees, thus amounts to $4,657,259.50, or 46.5% of the settlement.

### 3. Reaction of Class Members to the Fee Petition

■ We have received much commentary on the fees and costs requested by class counsel from the class members themselves. We did not solicit these commentaries. Class counsel sent a copy of the fee petition to all claimants who class counsel believed had valid claims, soliciting their support for the fee petition. Class counsel also provided the potential claimants with a form letter addressed to this court, in which the author supports the full award of the fee and costs petition. Most of the letters received were based on this form letter. Some claimants sent their letters directly to us; others sent their letters to class counsel, who then filed copies of the letters with us. While we emphasize that we did not request the comments of class members on this issue, we will briefly summarize some of their reactions to the fee petition as we feel that their reactions are important and should be considered in determining the fee award.

In total, we received directly 96 letters concerning the petition for fees and costs. Class counsel has submitted for our review 81 additional letters, which apparently were sent to class counsel rather than to us directly. It should be noted preliminarily that nearly all of the letters received expressed sincere appreciation for the efforts of class counsel in creating the settlement fund. Of the letters received directly by the court, 18 letters were sent by claimants whose final claim determinations revealed that they were not actually class members. Accordingly, we have not considered these letters in connection with our evaluation of the fee and costs petition.

Of the letters written by class members and received directly by the court, 53 stated that, after reviewing the petition for attorneys' fees and reimbursement of litigation expenses filed by class counsel, class counsel made an excellent recovery and should therefore be granted in full the fees and expenses requested. The 81 additional letters filed by class counsel also favor a full award to class counsel of the fees and expenses requested in the petition.

Of the letters written by class members and received by the court, 25 letters object in some way to the fee and costs petition. Among these objections, 11 letters noted that while the authors felt that the petition request was too high, they felt unqualified to advise the court regarding what amount would constitute a fair and reasonable fee for the attorneys involved in this case. These objectors left this issue to our determination, asking us to keep in mind that the class members (and not class counsel) are those who really suffered the losses in this case. Some of these letters further noted the fact that the $10,000,000.00 settlement fund is insufficient to compensate the class members for more than a mere fraction of their actual October 20, 1987 OEX losses. We acknowledge this fact and consider it in our determination of the fee petition.

One objection letter stated that while class counsel's request for fees and costs in excess of 50% of the settlement fund is excessive, in light of their risks of time and expenses, they should be awarded a minimum of 40% for fees and expenses combined. Seven objection letters stated that class counsel should be awarded no more than one-third of the settlement fund to cover their fees and expenses. One objection letter stated that an award to class counsel of 30% of the settlement fund would be the most fair and equita-

ble distribution. One letter stated that while an award of one-third is standard in cases of this type, the award here should be less than 30% because of the limited size of the settlement fund. One letter suggested that our grant of fees and costs not exceed 25% of the settlement fund. Another letter suggested that our grant of fees and costs not exceed 20% of the settlement fund. One letter suggested that we reduce our award to half of the amounts requested by class counsel for fees and costs. Finally, one letter suggested an award of attorneys' fees in the amount of $2,930,000.00, plus all costs.

We appreciate the efforts of the class members who took the time to review carefully the rather lengthy fee and costs petitions filed in this case, and who wrote to us with their comments. We assure them that we have put forth our best efforts to determine a fair and reasonable fee for class counsel in light of all of the facts as well as class members' comments.

### D. Analysis of the Fee Petition

#### 1. The Common Fund Doctrine

 Under the United States' no-fee rule, a court generally may not award attorneys' fees to a prevailing party unless it is expressly authorized by statute. *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). However, the Supreme Court has long recognized an exception to this rule: Where a representative plaintiff successfully establishes or protects a fund in which other class members have a beneficial interest, the costs of litigation may be spread among the fund's beneficiaries. *See Trustees v. Greenough*, 105 U.S. 527, 532, 26 L.Ed. 1157 (1882); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 389–97, 90 S.Ct. 616, ——, 24 L.Ed.2d 593 (1970); *Alyeska Pipeline Service, supra*. Under the common fund doctrine, attorneys for the successful party may petition the court for a portion of the fund as compensation for their efforts in creating or protecting that fund. The Supreme Court has noted that, "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fees from

the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, ——, 62 L.Ed.2d 676 (1980).

#### 2. Determining A Reasonable Fee: The Hybrid Approach

Determination of what constitutes a fair and reasonable fee award from a common fund is a delicate undertaking, calling for the informed exercise of judicial discretion under all the circumstances of the case. We have elsewhere discussed the history of attorneys' fee awards and the different approaches that various courts have adopted for determining fair and reasonable ·attorneys' fees. *See In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 255–63 (N.D.Ill.1979) (summarizing history of fee awards and approaches to calculating a fair and reasonable fee). In short, most courts utilize either a lodestar time/rate analysis or a percentage of the common fund analysis to determine an appropriate fee award. The Seventh Circuit has indicated that the decision whether to award attorneys' fees according to the lodestar method or the percentage of the fund approach rests in the sound discretion of the trial court. *Harmen v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir.1991) ("The decision of the whether to use a percentage method remains in the discretion of the district court."). *See also Kirchoff v. Flynn*, 786 F.2d 320, 329 n. 1 (7th Cir.1986) ("The *method* of calculating a fee award … rests squarely within the discretion of the district court.").

We have previously discussed at great length the choice between lodestars and percentages, noting both the problems with a straight percentage-of-the-pot approach and the objections to lodestars. *See In the Matter of Superior Beverage/Glass Container*, 133 F.R.D. 119, 123–29 (N.D.Ill.1990) (discussing advantages and disadvantages of both approaches). We will not repeat that discussion here. At that time, we reiterated our prior conviction ·that a hybrid approach should be utilized in determining fee awards, noting that "[w]e remain convinced … that rigid application of any method, whether lodestar or percentage, is a mistake but that some form of time/rate multiplier analysis

modified, if necessary, to reflect a reasonable percentage of the recovery, is the best way to calculate reasonable and fair fees." *Id.* at 124. Our hybrid approach utilizes certain aspects of both the lodestar and percentage of the fund methodologies. We continue to advocate this hybrid approach in determining fee awards under the common fund doctrine. In describing the hybrid approach, we emphasized the individual nature of fee determinations. Because every case is different, any method utilized by the court in determining fees must be flexible, so that it can account for the individual considerations of each case.

█ Under our hybrid approach, no final fee determination can reasonably be made without considering the size of the settlement. *Id.* at 128. In *Superior Beverage/Glass Container*, we stated:

[I]n no case, even under a time/rate analysis, should a fee award consume an untoward portion of the class recovery. And in this sense, even judges who use time/rate analyses always blend lodestars and percentages. No judge reasonably awards fees by looking *only* at hours. What is left for the class, after fees have been awarded, is always a paramount consideration. *The size of the settlement necessarily suggests upper (and lower) limits on permissible fees, in a common fund case, no matter how many hours were logged.* That is axiomatic. Hours are not rewarded simply because they were toiled. They are rewarded, consistent with the common fund theory, because they brought benefit to the class.

*Id.* at 126 (emphasis in original). In essence, we believe that the size of the fund recovered on behalf of the class should act to impose a cap on the amount of attorneys' fees that may be recovered by class counsel where straight lodestar compensation would consume an inordinate share of the common fund. This principle is a central factor in determining what constitutes a fair and reasonable fee award in this case.

### 3. Discussion of Fees Requested

█ In our Final Judgment Order of June 17, 1993, we approved the claims of approximately 521 class members who sus-

tained an aggregate total loss in the amount of approximately $24,691,297.63. Final Judgment Order, entered June 17, 1993. As discussed above, the settlement fund is $10,000,-000.00. By July 1, 1993, approximately $141,136.00 in interest was earned on the settlement fund. From these figures, it is clear that the plaintiffs in this case will be obtaining only a minimal recovery of their losses sustained on October 20, 1987. Including administrative fees and costs, class counsel have requested $4,657,259.50 for attorneys' fees and $1,255,398.14 for costs. These figures include the projected fees and costs for the remaining administration of the settlement fund. The total request by class counsel for both fees and costs equals $5,911,107.64, or approximately 59% of the settlement fund. The requested fees alone constitute approximately 46.6% of the settlement fund. This court could not in good conscience grant such an award to class counsel; an award of this size would be unfair to the class members and would constitute a windfall to class counsel. The suit would be primarily for the benefit of class counsel rather than their clients.

█ In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court confirmed in a statutory fee case that a reasonable fee is based on a number of factors, including reasonable hours expended multiplied by the prevailing hourly rate for one of comparable background, reputation, experience. However, the Court emphasized that the central factor to be considered was the result obtained. *Id.* at 433–37, 103 S.Ct. at 1939–41. The principle that the result obtained must be considered in determining the fee award is particularly applicable to the common fund case. The fee award may not infringe too substantially upon the recovery of the class members. Under our hybrid approach, the percentage-of-the-fund methodology should be applied in such situations to limit the award of attorneys' fees.

█ While the Supreme Court has not directly addressed this issue, it seems at least to have acknowledged the usefulness of the percentage-of-the-fund approach for this

purpose. In *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, —— n. 16, 79 L.Ed.2d 891 (1984), the Supreme Court noted with approval the use of a percentage of the common fund to determine attorneys' fees in common fund cases. In distinguishing attorneys' fee awards under fee shifting statutes, the Court stated, "Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation." *Id.* While we still do not advocate use of the pure percentage analysis to determine attorneys' fee awards in every case, our hybrid approach requires consideration of the results achieved and the damages of the class members in determining the fees recoverable by class counsel.

■ There can be no general rule specifying what percentage of a common fund may reasonably be awarded as attorneys' fees in every case because the amount of any fee must be determined according to the individual facts of each case—most particularly, the size of the common fund. As the Supreme Court noted, "[i]ndividualization in the exercise of a discretionary power [for the award of attorneys' fees] will alone retain equity as a living system and save it from sterility." *Sprague v. Ticonic National Bank*, 307 U.S. 161, 167, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939). *See also Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 679, 692 (M.D.Ala.1988). Commentators have noted that "the common fund itself is the measure of success ... and represents the benchmark on which a reasonable fee will be awarded." Herbert Newberg, *Attorney Fee Awards* § 2.07, at 417 (1986). For example, where—as here—the fund is comparatively modest in reference to the hours expended by class counsel on the case, the size of the fund is necessarily a limiting factor on the amount of attorneys' fees that can be awarded by the court from that fund. *See also Howes v. Atkins*, 668 F.Supp. 1021, 1025 (E.D.Ky.1987) (*quoting* Herbert Newberg, *Attorney Fee Awards, supra,* at 54) ("When the fund is modest in comparison to the hours expended, the small size of the fund is necessarily a limiting factor in the amount of

any fee that will be awarded from that fund."). We do not mean to suggest by this discussion that the results obtained for the class members in this case were not significant. In fact, we believe that class counsel performed well and obtained a fine recovery for the class. Ten million dollars is indeed a substantial sum. However, we must consider the size of that recovery in light of the hours expended, the rates charged, the total class damages, and the total fees requested. In this case, the total fees requested are highly disproportionate to the recovery obtained, notwithstanding the fact that it represents only 81.7% of the suggested lodestar amount for each firm.

■ In our above discussion of the fee petition, we noted several additional factors that we have considered in making our fee determination. First, the hours billed by partners in this case were excessive. We feel that more work could and should have been delegated to associates and paralegals. Second, the total number of hours billed in this case—by both partners and associates— was excessive. While we acknowledge the sincere efforts of class counsel to minimize the duplication of efforts, we believe that there was in fact significant duplication that should not be compensated. Also, the number of conferences held among class counsel in this case was excessive. Although many conferences were necessary and reasonable, the number identified in the time logs is excessive, especially in light of the large number of partners attending many of these conferences. Most importantly, as explained above, we have considered the size of the settlement fund—$10,000,000.00—and compared it to both the losses sustained by the class—almost $25,000,000.00—and the attorneys' fees requested by class counsel.

It is important to note at this point that counsel are to be commended for bringing this action to resolution short of trial, and for conducting themselves with professionalism throughout the case. We also appreciate the great efforts of all counsel involved to accommodate our various requests for detailed information concerning both the legal work performed and the disbursements made in

connection with this case. We recognize that our award of attorneys' fees must be adequate to encourage competent counsel to continue to pursue this type of complicated commercial securities litigation on behalf of a class. On the other hand, we must ensure that the class recovery is optimized. Having considered carefully the request for attorneys' fees, including the supporting memoranda and the appendices of affidavits and time logs, we are prepared to award attorneys' fees in the total amount of $2,900,-000.00, which represents 29% of the settlement. We regard this amount as the maximum fee recovery allowable under the circumstances of this case. We are convinced, after our careful examination of the fee request and supporting information, that this amount constitutes a fair and reasonable fee. Also, having received and reviewed in confidence a summary of the attorneys' fees billed and charged by the counsel for the defense in this case, we are convinced that our award is both fair and reasonable in the context of the legal services performed in the prosecution of this case.

Our award of fees in the amount of 29% of the settlement is within the "normal" range of attorneys' fees allowed in class actions of this type. We do not wish to over-emphasize this point as we believe that each case must be considered carefully in the context of its individual circumstances. Moreover, as stated above, we believe that our hybrid approach is preferable to the straightforward application of the percentage-of-the-fund method of fee determination. *Cf. In re Activision Securities Litigation*, 723 F.Supp. 1373, 1378 (N.D.Cal.1989) (court concludes that "in class action common fund cases the better practice is to set a percentage fee and that, absent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%").

However, commentators who have surveyed attorneys' fee awards in similar cases suggest that in common fund cases such as the one before us at this time, attorneys' fees are typically awarded in the range of 20% to 30%. *See, e.g.,* Herbert Newberg, *Attorney Fee Awards, supra,* at 51–52 ("In common fund cases attorney's fees should not usually exceed 50% of the fund recovered and are typically in the 20% to 30% range."); *Court Awarded Attorney Fees,* Report of the Third Circuit Task Force, October 8, 1985 (Arthur R. Miller, Reporter), 108 F.R.D. 237, 247 n. 32 (1985) ("Judges systematically awarded fees in the range of twenty to twenty-five percent of the fund . . . .").

Our research of case law supports the conclusion that fee awards typically range from 20% to 50% of the fund, and most often constitute 20% to 30% of the fund. *See, e.g., In re Telesphere International Securities Litigation,* 753 F.Supp. 716 (N.D.Ill.1990) (in securities class action, fees awarded constitute 21.7% of settlement fund of $1,519,-500.00); *In re Security America Corporation Securities Litigation,* 750 F.Supp. 352 (N.D.Ill.1990) (in securities class action, fees awarded constitute 11.4% of the $15,184,-951.00 common fund); *Rudolph v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 1990 WL 7168 (N.D.Ill. Jan. 18, 1990) (in securities class action, fees awarded constitute 15% of settlement fund of $10,000,000.00); *In re Gould Securities Litigation,* 727 F.Supp. 1201 (N.D.Ill.1989) (in securities class action, fees awarded constitute at least 20.4% of settlement fund of $10,000,000.00); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. at 697 (in securities fraud class action, fees and costs awarded constitute 30.-29% of $9,925,000.00 cash portion of $17,425,-000.00 common settlement fund); *Howes v. Atkins,* 668 F.Supp. at 1027 (in shareholders' derivative action, fees and costs awarded constitute 40% of cash settlement fund of $1,000,000.00); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 250 (S.D.Ohio 1991) (in class action, fees and costs awarded constitute 15.6% of $32 million cash portion of settlement of $56.6 million); *In re Cincinatti Gas & Electric Co. Securities Litigation,* 643 F.Supp. 148 (S.D.Ohio 1986) (in securities class action, fees awarded constitute 15% of common fund of approximately $14 million); *In re Dun & Bradstreet Credit Services Customer Litigation,* 130 F.R.D. 366, 375 (S.D.Ohio 1990) (fees awarded constitute 15% of settlement fund of $18 million); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 754 (S.D.N.Y.1985),

*aff'd,* 798 F.2d 35 (2d Cir.1986) (in securities fraud class action, fees awarded constitute approximately 25% of cash settlement fund of $18.4 million); *In re TSO Financial Litigation,* 1989 WL 80316 (E.D.Pa. July 17, 1989) (fees awarded constitute 23% of settlement fund of $2,850,000.00); *Harman v. Lyphomed, Inc.,* 787 F.Supp. 772, 778 (N.D.Ill. 1992) (in securities fraud class action, fees awarded constitute 20% of settlement fund of $9,900,000.00); *Edmonds v. United States,* 658 F.Supp. 1126, 1128–30 (D.S.C.1987) (in class action, fees awarded constitute 5% of common fund of approximately $27–30 million); *In re Activision Securities Litigation,* 723 F.Supp. 1373, 1378 (N.D.Cal.1989) (in securities class action, fees awarded constitute 30% of the common fund).

Several other courts have also surveyed recent cases and reached similar conclusions regarding the amounts typically awarded as attorneys' fees in common fund cases. *See, e.g., Warner Communications Securities Litigation,* 618 F.Supp. at 749–50 (survey of cases suggests that fees are typically awarded in the range of 20% to 50% of common fund); *Enterprise Energy,* 137 F.R.D. at 250 (survey of cases reveals fee awards ranging from 18% to 33% of common fund); *Harman,* 787 F.Supp. at 774 (survey of recently reported class action securities fraud cases from Northern District of Illinois reveals fee awards ranging from 10.3% to 21.7% of common fund); *TSO Financial Litigation,* 1989 WL at App. A. (appendix of fee awards in class actions, concluding that fee awards are typically 19% to 45% of the common fund). *See also In re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. 297 (N.D.Ga. 1993) (fees awarded in common fund cases typically constitute 20% to 30% of fund).

### 4. An Alternative: The Market Approach to Attorneys' Fees

While we continue to advocate application of the hybrid approach articulated above, we note that several alternative approaches to fee determinations have recently been proposed. In their petition, class counsel have directed our attention to one new method in particular. In *In Matter of Continental Illinois Securities Litigation,* 962 F.2d 566 (7th Cir.1992) (Posner, J.), the Seventh Circuit

articulated an alternative method of attorneys' fee determination based on an analysis of the relevant legal market.

The court first noted that the object in awarding a reasonable fee is to give the lawyer what he would have gotten in an arm's length negotiation, had one been feasible. In a class action suit, the court suggested that much time and expense might be saved by abandoning the lodestar computation and, instead, basing the reasonable attorneys' fee on fee arrangements for similar services within the relevant market. The court stated:

> The judicial task might be simplified if the judge and the lawyers bent their efforts on finding out what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character.... The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.

*Id.* at 572. The court further suggested that in making such a determination, the trial court should obtain "evidence about the terms of retention in similar suits, suits that differ only because, since they are not class actions, the market fixes the terms." *Id.* at 573.

In its supplemental petition, class counsel have attempted to provide us with such evidence. They have submitted for our consideration the affidavits of several prominent Chicago attorneys who regularly engage in commercial contingent fee litigation. We will briefly review these affidavits.

Myron M. Cherry, of Cherry & Flynn, states in his affidavit that he would not undertake a representation such as the plaintiffs in this case unless he would be able "to charge a minimum of 33%, and more likely 40% to 50%, of the recovery." Aff. of Myron M. Cherry, at 2. In setting the fee, he normally considers the difficulty in stating and maintaining a cause of action against an exchange and the estimated cost in attorney-time required to prosecute such a suit against the vigorous defense mounted by a well-financed national exchange. *Id.* at 1. In addition, Cherry would expect the client

to pay the costs of pursuing the case. He also notes that his firm often requires a negotiated, non-refundable retainer in addition to the contingent fee. William J. Harte states that he ordinarily charges a contingent fee from 33.33% to as high as 50%, depending on the following factors: (1) the difficulty in establishing liability; (2) the extent to which the defendant will be represented by competent, well-financed counsel; (3) the extent to which expert testimony will be required; (4) the extent to which such expert testimony is readily available; (5) the extent to which the defendants have a reputation for willingness to settle claims; (6) the extent to which a successful verdict or judgment can be collected; and (7) the extent to which they will be successful in convincing other contingent fee plaintiffs' lawyers to join with them in the litigation in order to spread the risk. Aff. of William J. Harte, at 2. He also notes that he had never heard of anyone who has successfully sued and obtained a money judgment or negotiated a settlement where a national exchange has agreed to pay money damages. *Id.* at 1.

Michael B. Hyman, of Much, Shelist, Denenberg, & Ament, P.C., states that experienced, competent counsel would normally not be attracted to cases such as this litigation unless they could reasonably anticipate recovering attorneys' fees "amounting to 33% to 40% of the total amount recovered for the class or fees based on an enhancement or multiplier up to three or more times over customary hourly (lodestar) rates." Aff. of Michael B. Hyman, at 2. In deciding whether to undertake the representation, his firm conducts a financial analysis, apart from any legal or factual analysis of the plaintiff's claim, to ensure that the case would be profitable. He also notes that his firm considered and rejected filing a case similar to this litigation at the time that this litigation began. *Id.* at 1. Peter M. King, of Canel, Davis & King, states that in determining an appropriate contingent fee to charge a client in a suit against a national securities or commodities exchange, he would consider "the extreme difficulty in stating a cause of action against an exchange coupled with the very rigorous defense that can be expected not only from the exchange's well-financed

and competent counsel, but also from other exchanges who might be affected by the outcome of the case in question." Aff. of Peter M. King, at 1–2. He would not undertake representation such as this case unless he would be able to charge a contingent fee of 40%, plus the costs of the litigation. *Id.* at 2.

Clinton A. Krislov, of Krislov & Associates, Ltd., states that, if he would have undertaken the case, he would require a very high percentage fee of 50% plus costs of litigation, due to the complexity of the case and the low likelihood of success. Aff. of Clinton A. Krislov, at 2. He notes that the normal fee of 33.33% would be unacceptable here in light of the lack of a strong cause of action. He further notes that it is "generally viewed that the lawyers' gross share should not exceed the clients' gross recovery." *Id.* David A. Novoselsky states in his affidavit that he would not undertake a representation such as the plaintiffs in this case unless he was able to charge a minimum of 40% (and more likely 50%) of the recovery. Aff. of David A. Novoselsky, at 2. In determining an appropriate contingent fee to charge a client in a suit against a national securities or commodities exchange, he would "consider the extreme difficulty in stating a cause of action against an exchange coupled with the very vigorous defense that can be expected not only from the exchange's well-financed and competent counsel but also from other exchanges who might be affected by the case in question." *Id.* at 1–2.

Lowell E. Sachnoff, of Sachnoff & Weaver, Ltd., states that if the plaintiffs in this litigation were a private client, his firm would not have agreed to take on the litigation without a firm contingent fee agreement in the range of "35% to 45% of the recovery with the client paying the costs of the litigation on a regular basis." Aff. of Lowell E. Sachnoff, at 4. He states without qualification that his firm "would not accept a plaintiff class action such as *Spicer* without some assurance based on applicable law that if we prevailed and conferred a substantial benefit, monetarily or otherwise, we would be paid an appropriate premium over our regular hourly rates." *Id.* at 3. He notes that the litigation in this case carried with it a very substantial degree of

risk at the outset because the claims were novel and the legal basis uncertain. Terry Rose Saunders states in her affidavit that in determining an appropriate contingent fee to charge a client in a suit against a national securities or commodities exchange, she would "consider the extreme difficulty in stating a cause of action against an exchange coupled with the very vigorous defense that can be expected not only from the exchange's well-financed and competent counsel but also from other exchanges who might be affected by the outcome of the case in question." Aff. of Terry Rose Saunders, at 1–2. Accordingly, she explains that she would not undertake an engagement such as this litigation unless she would be able to charge a minimum of 33% and up to 40% of the recovery under circumstances where she would also be assured of receiving from any settlement or verdict at least the value of her time. *Id.* at 2. She further notes that she would expect the client to pay the litigation costs.

In addition to these affidavits, two of the attorneys who served as lead counsel in this case have also filed affidavits. Edward T. Joyce, of Joyce & Kubasiak, P.C., notes that representing plaintiffs in commercial litigation is difficult because the theories of liability are very complex and are often difficult to explain to a jury, both the fact and amount of damages are difficult to quantify and explain to juries, and the defendants are usually represented by experienced and well-qualified attorneys who raise every conceivable defense, making prosecution of the case very expensive. Due to these factors, his firm does not customarily accept commercial contingent litigation unless the client is willing to pay a contingent fee of between 40% and 50%, and then only if the client is prepared to advance a substantial portion of the costs of pursuing the claim. Aff. of Edward T. Joyce, at 3. In support, Joyce has also submitted for our information a sample of sixteen contingent fee contracts that his firm has entered into with its clients for the prosecution of commercial litigation. Eleven of these contracts require the client to pay 50% of the gross recovery before reimbursement of costs and five require the client to pay 40% of the gross recovery before reimbursement of costs. It should be noted that one of

these contracts specifies that the attorneys' fee shall be 33.33% of any settlement or 40% of any sum recovered through trial. Another specifies that attorneys' fees shall be 25% of any settlement if no complaint is filed in court. Two others specify that attorneys' fees shall be 33.33% if recovery is achieved before responsive pleadings are filed by the defendants.

Stephen B. Diamond, of Beeler, Schad & Diamond, describes in his affidavit the challenging nature of this case. He states that when he undertakes on a contingent fee basis cases (which are normally less difficult than the litigation at issue here), he requires both that the client pay costs on a regular basis and that they pay a 40% contingent fee. Aff. of Stephen B. Diamond, at 3. According to Diamond, the 40% is applied to the total recovery and does not permit any subtraction of costs before calculating the percentage.

In addition to the above-mentioned affidavits and contingent fee contracts, we received from one class member a copy of a letter sent to him by another of the class attorneys in this case—Herbert Beigel. This letter is particularly instructive on what fees attorneys comparable to those involved here normally charge for litigation such as that involved in this case. In the January 21, 1989 letter, Beigel offers, in the event that no class is certified by the court, to represent the class member individually for a contingent fee of 33.33% of any amount recovered, plus costs. We find this letter—an actual offer of representation by an attorney *in this case* to a plaintiff *in this case* regarding the specific facts *of this case*—to constitute much better evidence of what the market normally would pay for the services rendered in this case than the affidavits and contracts submitted by class counsel, most of which make no distinction between a settlement in which the risk of receiving no compensation is obviated and a trial.

■ In its discussion of the market approach, the Seventh Circuit was careful to note that in applying the market approach to fees, the court must also consider the nature of the recovery obtained for the class. In discussing the possible application of the

market approach to the case before it, the court specifically referred to the size of the recovery—$45,000,000.00. *Continental Illinois Securities,* 962 F.2d at 572 ("This was a contingent fee suit that yielded a recovery for the 'clients' (the class members) of $45 million."). As noted above, we feel that this point cannot be over-emphasized: The results achieved for the class necessarily play an important role in determining what is a fair and reasonable fee for the attorneys who facilitated those results. We believe, given the size of the settlement fund obtained for the class in this case, that our award of $2,900,000.00 in attorneys' fees is both fair and reasonable.

### 5. Conclusion

In accordance with the above discussion, we award attorneys' fees in the total amount of $2,900,000.00. This award includes the fee award for legal work performed in this case as well as the hours spent administering the settlement fund. The award also covers any future fees expended in the remaining administration of the fund. As noted above, we have already made two interim awards of attorneys' fees and expenses. Our first award was for attorneys' fees in the amount of $500,000.00 and for reimbursement of litigation expenses in the amount of $250,000.00. Order, entered February 12, 1993. Our second interim award was for a total amount of $1,000,000.00, with no specific designation made regarding what portion constituted fees and what portion constituted expenses. Order, entered June 17, 1993. We now clarify that the entire amount of the second interim award constituted an award of attorneys' fees, bringing the total interim award of fees to $1,500,000.00. Accordingly, this amount already paid to class counsel must be deducted from the total award of fees, and we now award class counsel additional fees in the amount of $1,400,000.00.

Ideally, allocation of the fee award is a private matter to be handled among class counsel. Herbert Newberg, *Attorney Fee Awards* § 2.16 (1986). Although class counsel have not submitted with their petition a negotiated allocation agreement, they have informed us that they have agreed among themselves upon a methodology to be used to distribute our award among the six firms involved in this case. Accordingly, we will not order a specific allocation of our award among the firms. Should the firms require such an order, they have ten days in which to petition this court to make such an allocation.

### III.

### EXPENSES

Class counsel originally requested $1,207,397.24 for expenses associated with this case (petitions of 1/15/93 and 5/10/93); upon revision, that total was reduced to $1,197,553.77 (petition of 7/9/93). They then submitted a supplemental petition with an additional $8,025.58 in case expenses and $44,746.79 in administrative expenses, and a second administrative expense petition for $5,072.00 (replacing part of their first administrative petition), for a grand total of $1,253,848.14. The majority of this amount is requested to pay the fees of various experts which total $817,264.88. We discuss each category in turn below, as the request was presented to us. In general, however, we have considered whether the category of expense should be part of general overhead, or is chargeable to the class in this case, and also whether the specific expenditures were reasonably necessary in this case.

### A. *Individual Firm Expenses*

#### 1. Long Distance Calls

■ Each firm submitted individual requests for payment of their phone bills. The total requested was $5,734.74. We have allowed for long distance calls, but not for cellular calls. Cellular phones may be a convenience but they are not a necessity, and most of the cellular phone calls were local.

■ *Beeler, Schad & Diamond:* They have requested $3,683.74, of which we have found valid receipts for $2,690.03. We do not allow the 20% mark up that Beeler, Schad & Diamond apparently makes routinely.

■ *Futterman & Howard:* They requested $194.03 and gave a general explanation of what long distance calls were made,

but did not provide any documentation to support this request. No costs are allowed.

*Beigel & Sandler:* They requested $1,331.07 and gave a general explanation of what long distance calls were made, but did not provide any documentation to support this request. No costs are allowed.

*Cohen, Milstein, Hausfeld & Toll:* They requested $206.02, but did not provide any documentation to support this request. No costs are allowed.

*Fishman & Merrick:* They requested $50.28 and gave a general explanation of what long distance calls were made, but did not provide any documentation to support this request. No costs are allowed.

*Joyce & Kubasiak:* They requested $269.60, and we found $106.86 in valid bills.

## 2. Facsimile

■■■■■ Law firms are responsible for assuming some expenses as part of overhead, and we find this to be one of them.[1] This is not even a close question to the extent that firms charge not only for sending a fax (which could include long distance phone charges) but also for receiving a fax. Overall, however, we consider the fax to be a modern day messenger, part of common office expenditures, and assignable to overhead. The firms requested a total of $9,611.54 which is denied.

## 3. Messenger

■■■■■ As with some other requested costs, or things like secretarial services, we find that the payment of messengers to deliver documents is part of general overhead. While the details are unimportant since this category will not be included, we note in passing that several firms submitted "charges" based on sending their own mes-

sengers on deliveries, and that these charges often exceeded that of the commercial firm's receipts that we examined. Law firms have no right to make a profit off of incidental activities such as delivering documents. This request for a total of $2,585.98 is denied.

## 4. Air Express

■■■■ While ordinary postage can be expected to be included in overhead, we do find it reasonable to reimburse the firms for their express mail costs, particularly given the volume of materials that needed to be exchanged with their expert in New York City and the material that was subpoenaed from trading firms nationwide.

*Beeler, Schad & Diamond* requested $1,414.76, however we found valid receipts for only $1,334.26 which is allowed.

*Beigel & Sandler* requested $514.57, however their documentation does not indicate which of many Fed Ex charges were incurred in this case as opposed to others. Nothing is allowed.

*Joyce & Kubasiak* requested $257.87, and we found valid receipts for $189.52.

## 5. Court Fees/Costs

■■■■ *Beeler, Schad & Diamond* has (upon revision) requested $57.00 for filing an appearance. However, having checked the fee schedule adopted by the Judicial Conference and confirmed with the office of the clerk for the Northern District of Illinois, we find that while a fee is charged for filing a complaint, no such fee is charged for filing an appearance in a case. The receipt provided is a petty cash receipt, with no evidence that the funds requested were paid to the U.S. District Court. This request is not allowed.

1. Class counsel have cited to this court's opinion in *Chicago Professional Sports Limited Partnership and WGN Continental Broadcasting Co. v. National Basketball Association,* 1992 U.S.Dist. Lexis 19473 (N.D.Ill. 12/18/92) in which we allowed facsimile and messenger charges. However, in that case the party that was to pay the costs had made no objection to the amount or nature of the costs requested. In this case there is no adversary party to dispute the amount of costs, but some class members have expressed concern

about the amount of costs in this case, and we feel it is our duty to look after the interests of the class. *Skelton v. General Motors Corp.,* 860 F.2d at 253 ("The court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications.") Thus, we allowed the photocopy costs requested by WGN uncut, although in all of our other opinions on costs we have cut the amount of photocopying, as we do in this case (see below).

■ *Futterman & Howard* has requested $120.00 for filing a complaint which is allowed.

*Beigel & Sandler* has requested $222.50; however, only $120.00 is documented and allowed.

*Cohen, Milstein, Hausfeld & Toll* has requested $20.00, but there is no documentation and no costs are allowed.

*Fishman & Merrick* has requested $240.00; however, only $120.00 is documented and allowed.

■ *Joyce & Kubasiak* has requested $198.50. We have found $31.50 in valid expenses. Their request to charge the class $3.00 per month as an "internal docketing fee" is not allowed. The expense of keeping track of filings and deadlines and other activities of the docketing department of the firm are part of overhead, not an out-of-pocket expense that can be charged to the class.

### 6. Court Hearing Transcripts

■ While local court rule 45B explicitly applies only to costs awarded the prevailing party under Fed.R.Civ.Pro. 54(d), we believe it is a good guide of what constitutes reasonable costs. Although class counsel suggest that Rule 45B applies only to court hearings, and not to deposition transcripts, the text of the rule specifically mentions depositions. See also *EEOC v. Sears*, 1987 WL 11642 (N.D.Ill. May 27, 1987). Accordingly, we have reduced the amount requested to pay court reporter fees to comply with the maximum rates established by the Judicial Conference both here and with deposition transcripts below. The Judicial Conference rate does not allow charges for attendance fees, and those have been cut. Finally, while the Judicial Conference instructs reporters that may charge *their* actual cost for a computer diskette copy (i.e., a few dollars at most), that does not mean, as class counsel argue, that class counsel is entitled to be reimbursed for what they actually paid ($30–35).

■ *Beeler, Schad & Diamond:* The request is for $2,189.84, and under the maximum allowable rates, $1,705.50 is permissible. However, local rule 45B allows for costs of transcripts to be taxed only if the transcript was "necessarily obtained" for use in the case. The transcripts requested here include 36 different status hearings and motion calls over more than four years—almost every one that was held. Several status conferences involved no discussion of substance for which a transcript was necessary (although it may have been convenient). A search of notes from September 1991 through settlement of this case in December 1992 revealed at least three court dates for which transcripts were not necessary. Extrapolating this over the course of the litigation, we believe that at least nine of the 36 transcripts were unnecessary, or 25%. However, because the transcripts from those days would also be shorter, we have actually only reduced the award by 20%. Thus, the total amount awarded for court hearing transcripts is $1,364.40.

*Joyce & Kubasiak:* For the reasons discussed above, their request for $88.00 is reduced to $66.00.

### 7. Service of Process

■ *Beeler, Schad & Diamond:* This request for $665.00 to serve deposition subpoenas on 17 people and make attempts on three is reasonable, and is allowed in full.

*Joyce & Kubasiak:* This request is for $5,933.00 that was paid to Special Process Service Company. This cost is reasonably necessary, and is allowed in full.

### 8. Deposition Transcripts

The same rules were applied to the rates allowed to court reporters for depositions as for court hearings, and the corresponding reductions were made.

*Beeler, Schad & Diamond:* $3,562.50 is requested; $2,273.75 is allowed.

*Futterman & Howard:* $442.00 is requested; $150.75 is allowed.

*Cohen, Milstein, Hausfeld & Toll:* $171.25 is requested; $81.00 is allowed.

*Joyce & Kubasiak:* $2,807.85 is requested; $785.25 is allowed.

### 9. Witness Address Search Fees

*Beeler, Schad & Diamond:* The total revised request of $357.98 is allowed.

*Joyce & Kubasiak:* The request is for $4,469.50 owed to Checkmate Consulting, Financial and Investigation Specialists. This amount is reasonable and allowable.

10. Class Notice Publication and Mailing

*Beeler, Schad & Diamond:* This request for $2,026.09 is allowed in full.

11. Subpoena Fees/Witness Fees

*Cohen, Milstein, Hausfeld & Toll:* Their request for $45.00 is allowed.

*Joyce & Kubasiak:* This request is for payment of witness fees under 28 U.S.C. § 1821. Their revised request for $2,430.51 is approved.

12. Expert Witness—Office Expenses

■ *Beeler, Schad & Diamond* is requesting $36,000.00 for space within their offices that was occupied by experts for this case. They argue that they could have earned that much in rents from other tenants if the experts were not there, and that it was essential for the experts to be there. We find this expense no more entitled to reimbursement than the rent on the offices occupied by the lawyers involved in this case.

13. Expert Witnesses—Other Consultants

■ *Beeler, Schad & Diamond:* They have requested a revised total of $638.74 for payments made to a market analyst who reviewed a report and to an anonymous market maker who gave them a great deal of background information. This request is approved.

*Futterman & Howard* requests $1,425.85 for their share of the payment to the market maker mentioned above. This is approved.

*Beigel & Sandler* has withdrawn their undocumented request.

*Cohen, Milstein, Hausfeld & Toll* requested $541.41, their share of payments made to the market maker. This is allowed.

14. Expert Witnesses—Harrigan

■ *Joyce & Kubasiak:* This request is for $13,929.00, representing 184 hours at an hourly rate of $75.00, and $129.00 in expenses. His rate was reasonable. His hours, however, were not reasonable. His second invoice shows several two-hour trips to pick up documents, lots of meetings, and extensive reviewing of documents. While his expertise may have been useful, most of his hours seem wasteful (the time spent picking up documents—messenger services are much cheaper) or excessive (the number of hours reviewing CBOE rules and prospectus—this court did not begin with Harrigan's professed expertise and was able to read and understand the documents in less time than he spent). Thus, the number of allowable, reasonably necessary hours we find out of 132 is 48. Out of the first 52 hours, we allow 29.5. The total number of hours allowed is 77.5, for a total of $5,812.50, plus expenses, giving a grand total of $5,941.50.

15. Demonstrative Evidence

■ *Joyce & Kubasiak:* They have requested $7,920.00 for 24 trial exhibits that were completed before settlement (although not enlarged and mounted, saving $170.00 per) at $330.00 each. These exhibits used graphics to explain how the options trading pit functioned. This expense is allowable.

16. Computer Support

■ *Beeler, Schad & Diamond:* They have requested $33,763.10 for hardware and software (excluding items that they are now using for other projects). As with desks and chairs, legal pads and typewriters used by the firm and its employees, we believe that these costs are part of the overhead for running a firm. Even if they required more computers to work on this case than they will be using in the future to work on others, the computers are perfectly usable office equipment. Even if the equipment provides more computer power than is necessary for word processing and other common tasks, the firms may very well take on other cases involving large amounts of data—other securities cases, anti-trust cases, many types of cases would require such computing power. If they truly believe that they will not be using some of this equipment in the future, they can sell it in the used computer market. While they argue that computer equipment has a very short life span, this opinion is being drafted on a computer that is four years old and will undoubtedly be serviceable

for a few years more. It may not be the cutting edge, but the cutting edge is not always, or often, "reasonably necessary." We find no basis to allow any of these requested costs.

### 17. Conference Expenses

 *Beeler, Schad & Diamond:* This request is for $1,529.08. While it is called "conference expenses," this really consists of petty cash receipts for meals. While the lawyers may have discussed the case while eating these meals, they are not reasonably necessary expenses that are so connected with the case that the class should pay for them out of the settlement fund. The meals would have been eaten regardless of whether there was a pending case or not.

### 18. Photocopy Costs

 The firms' requests for photocopy costs consist primarily of copies that they have made themselves, and they ask to be reimbursed at $.20 to $.25 per page for these copies. We do not believe that firms are entitled to run their photocopy operations as profit centers, and we do not believe that the charged rates reflect the actual costs to the firms.[2] In fact, in their supporting memorandum of May 10, 1993, they indicated that they set their charges based on what other firms were charging—the market as they saw it, not just the actual cost of the copying. If their actual costs are that high, they should not be doing the copies themselves, they should bring the work to a copy shop that can charge a more reasonable rate. After checking rates at local copy shops, we have decided that it will be generous enough to allow the firms $.10 per page for in-house copies.[3] Furthermore, while we have not examined all of the documents that were copied to determine if making each copy was

"reasonably necessary," we are well aware that many copies are made out of convenience and not necessity. Based on our experience with complex litigation and bills of costs, we have cut the number of copies requested by half, and allowed that number at $.10/page.

*Beeler, Schad & Diamond:* Their request totalled $62,245.21. This included 299,909 in-house copies and $2,243.79 in outside copies. From the receipts for outside copies we allow $1,942.56.[4] The claimed in house copies were documented and then some—we found 300,209 copies, and we will work from that figure since we made cuts elsewhere when we did not find acceptable documentation. As described above we will therefore allow 150,105 copies, for $15,010.50 in-house. The total allowed is thus $16,953.06.

*Futterman & Howard:* Their request is for $2,112.64. This includes 8,491 copies, some billed at $.20 and some at $.22. We will allow 4,246 copies at $.10, for a total of $424.60. Their outside copy costs of $368.50 are allowed. Thus, the total allowed is $793.10.

*Beigel & Sandler* has requested $6,825.92, including $11.00 in outside copying, and has documented 20,661 internal copies. We will allow 10,331 copies, for a total of $1,033.10 internal and a grand total of $1,044.10.

*Cohen, Milstein, Hausfeld & Toll* has requested $1,687.74, but no supporting documents were submitted, and no costs are awarded to them.

*Fishman & Merrick:* They have requested $1,019.05. Their outside copy receipts of $32.35 are allowed. They have reported 4,654 copies in-house, from which we will allow 2,327 copies, or $232.70. The total for photocopies is thus $265.05.

---

**2.** We also note that one of Beeler, Schad & Diamond's tenant bills submitted in support of another expense request shows that Beeler, Schad & Diamond bills its tenants $0.15 per page for photocopying.

**3.** This rate has been used by other judges as well, see e.g. *BASF Corporation v. The Old World Trading Company, Inc.,* 1992 WL 229473, 1992 U.S.Dist. LEXIS 13691 (N.D.Ill. Sept. 11, 1992).

**4.** This excludes from the request one cab ride, one undocumented charge, and the 20% markup on 3 charges. We also found that 10 copies of the SEC report on the October 1987 market break were bought for $273.15 in addition to 4 copies purchased for $114. While we understand the importance of this report and the convenience of having more than one copy, we find that 14 copies is excessive, and will allow only for the cost of 4.

*Joyce & Kubasiak:* They have requested $16,353.95. Their outside copying of $456.10 is allowed. Their request also includes 66,090 in house copies. We will allow 33,045 copies or $3,304.50 in house. The total allowed is $3,760.60.

### 19. Printing & Binding

■ *Beeler, Schad & Diamond:* They have requested $779.92. While ordinarily printing documents is part of overhead, Beeler, Schad & Diamond has requested reim-. bursement for special paper and ink cartridges which they purchased in order to do color graphs. The cost of outside production of these graphs would have exceeded the amount of their request. To the extent that the receipts show that they were for such special supplies, we will allow the request; however petty cash receipts which simply state "supplies" are insufficient. We will allow $272.51.

*Joyce & Kubasiak:* This request is for $996.00 from internal charges. When the firm binds large documents, they charge $3.00 per 50 pages. However, Kinko's Copy Shop will do the same at $3.95 for any document up to 300 pages. Thus, they could have fulfilled the binding needs noted on the submitted documents for only $213.30.

### 20. Staff Overtime Expenses

■ *Beeler, Schad & Diamond:* They have requested $365.72 for petty cash disbursements to their employees for meals eaten when working on overtime. While Beeler, Schad & Diamond may choose to compensate their employees in this fashion, this is not an expense that the class need reimburse them for.

■ *Joyce & Kubasiak:* They have requested $2,501.14 for overtime pay, but their documentation shows only the number of hours worked, not the amounts paid to the people who reported overtime. This does not matter, however, because, as with all clerical salaries, this is part of overhead.

### 21. Books & Publications

■ *Beeler, Schad & Diamond:* They have asked for $1,163.83. From the documentation provided, we find $427.49 to be allowable. We do not allow for the purchase of books that are of more general use, including for instance instructional manuals for their computer software.

*Fishman & Merrick:* They have requested $43.15, which is approved.

*Joyce & Kubasiak:* This request for $892.79 is not completely documented, but we do find $243.90 in allowable purchases. We will not require the class to pay for a copy of *The Chicago Manual of Style* or other books that were not targeted very specifically towards the needs of this case.

### 22. Computerized Legal Research

■ Although in years past we have been more skeptical of Lexis and Westlaw charges, computerized legal research has become an integral and necessary part of a good law practice. Furthermore, their speed of searching makes their use efficient because they save hours of attorney time that would otherwise be charged to the class. Finally, the Seventh Circuit has held that it is error to exclude this category of costs. *In Matter of Continental Illinois Securities Litigation,* 962 F.2d 566, 570 (7th Cir.1992). However, because there is virtually inescapable waste from an occasional mis-worded search or repeated request, we have discounted the requested amounts by 25%.

■ *Beeler, Schad & Diamond:* They have requested $15,202.99, the documentation supports charges of $11,621.01, and as explained above, we will allow $8,715.76. We consider the $20.00 subscriber fee to be part of overhead, and the random allocation of the entire month's tax bill to this case on some months and no tax charges on other months is not allowable.[5]

*Futterman & Howard* requests $1,550.66; we allow $1,163.00.

---

**5.** It should not be too difficult to either ascertain the percentage of the tax, and apply it to the amount billed for this case, or to figure out what percentage of the total bill is allocable to this case and take a corresponding percentage of the total tax. If roommates splitting a phone bill can do this, a law firm ought to be able to. They have not done so, and we do not have sufficient information to do their job for them.

*Beigel & Sandler* requests $780.42, and we find documentation for $286.86. Therefore, we allow $215.15.

*Cohen, Milstein, Hausfeld & Toll* requests $1,239.69, with documentation showing $1,062.37. We will allow a total of $796.78.

*Fishman & Merrick*'s request was undocumented and withdrawn.

■ *Joyce & Kubasiak:* Their revised request is for $8,320.47. We find some of their documentation unacceptable: they submitted Westlaw printouts showing the time used with handwritten notes indicating the dollar amount they would like to be reimbursed for, they also submitted actual Westlaw bills showing searches billed for, and, where there was a match between the bills and the individual receipts, the individual receipts were often marked up significantly from the cost shown on the Westlaw bill. Thus, we will only consider crediting the searches shown on the actual Westlaw bills. These total $6,320.01, and we will therefore allow $4,740.01.

### 23. Letter of Credit Fees

*Beeler, Schad & Diamond:* They have requested $2,299.32. However, we believe that their cash flow problems, which made Blin fearful that he would not be paid, are their responsibility, and resulting additional expenses may not thereby be charged to the class.

*Joyce & Kubasiak:* The same reason requires that we deny this request for $2,468.75.

### 24. Travel

■ *Beeler, Schad & Diamond:* Their total request is for $4,582.72. A good portion of this request is supported by petty cash receipts for cab fare, tolls or parking for trips to the library, to make deliveries, to home after working late, or into the office on a Saturday. We will not award any of these expenses; the travel requested is part of the daily life of a law firm, not an unusual out-of-pocket expense. We have particular problems with a few receipts which claim trips to the Daley Center for status hearings or for

motions.[6] None of the status hearings in this case were held at the Daley Center. We recognize that with the number of receipts included and the size of this request, perfection is impossible, and there were several other receipts for trips to the Daley Center to do research for this case, which counsel understandably requested reimbursement for. However, the inclusion of charges that so clearly are not the responsibility of the class in this case (even after this specific problem was mentioned) calms any concern we might have that we are erring on the side of underinclusion.

There are allowable travel expenses due to depositions, however. We will allow $1,442.39.

*Futterman & Howard:* They have requested $1,225.18. A sizable percentage is for cab fare and other expenses disallowed above. They do, however, have reimbursable travel expenses for a deposition, totalling $810.68.

*Beigel & Sandler:* They have requested $3,633.33; again much of it is disallowed. The $838.28 which covered Myles Spicer's travel expenses due to his deposition is allowed, however.

*Cohen, Milstein, Hausfeld & Toll:* They have requested $1,330.81. As above, most of this is not allowed; however $562.00 for airfare is allowable.

■ *Fishman & Merrick:* They have requested $705.50. Again the routine use of cabs is not an allowable expense. The main charge was $669.00 for three to travel between Chicago and Grand Rapids by plane, to meet with one of the class representatives. We do not mean to pick nits, but the same trip by train would only cost $154.00 for three people, and only take a couple of hours more. As with copy costs and other expenses, counsel have a duty to the class to do things in an economical, cost-efficient fashion. We will allow $154.00 in travel costs.

*Joyce & Kubasiak:* They have requested $6,563.34. Again much is disallowed; however, there were legitimate travel expenses re-

---

**6.** Receipts of 9–18–90, 2–12–91, 2–13–91, and 4– 16–91.

lating to depositions or meetings with their expert. We find $3,334.31 allowable.

### 25. Miscellaneous

■ While some of the ledger entries submitted in support of these requests are not particularly legible, we are informed that most of the requests (totalling $5,329.52 for all firms) are for "working lunches" or other meals. As discussed above, such expenses will not be allowed.

■ *Beeler, Schad & Diamond* also requests reimbursement for $576.00 they spent for special ventilation in their offices so that they could work in the days after the Great Chicago Flood. While we recognize that they faced difficulties in using their offices at the time of the flood, and appreciate their perseverance in working through it, this expense was not made necessary by this case. It is part of general overhead. Beeler, Schad also deleted a request accidentally included in photocopying and asked that it be considered under miscellaneous. While a bottle of wine from Marshall Fields is indeed miscellaneous, it is not chargeable to the class. Apparently the wine was a gift for Mr. Blin. We believe that the nearly $400,-000.00 paid to Blin was sufficient compensation for his efforts in this case.

■ *Joyce & Kubasiak* requests reimbursement for the cost of transferring and copying promotional videotapes used by the CBOE. One set of these films was submitted to the court, and other copies were to be shown to the jury. This expenditure, totalling $403.00, is allowed.

### 26. Postage

Requests for postage costs total $2,525.83. However, where postage was necessary for a large and non-routine item, such as mailing notice to the class, it has already been included. In addition, none of the requests were completely substantiated. No costs are allowed in this category.

### B. *Shared Expenses*

### 1. Court hearing transcripts

This request was reduced in accordance with local rule 45B, as discussed with individual expenses above. The revised request is for $90.00, we allow $54.00.

### 2. Deposition transcripts

They have submitted a revised request of $51,352.59; however, only $46,335.31 actually appears from the receipts to be for deposition transcripts. The costs for transcripts have been reduced as above, to a total of $34,079.25. The remaining receipts are for other deposition expenses. Fed ex bills, totalling $1,286.75, are allowed as air express was above. Class counsel also requests reimbursement of photocopying performed in connection with depositions, but for convenience we will consider that request, together with all of the other shared photocopy costs, below. Thus, the total allowed in this category is $35,366.00.

### 3. Witness address search

This request for $247.80 is allowed.

### 4. Class notice mailing

■ This request is for $11,748.98. Postage of $837.10 and a newspaper ad of $5,209.68 are allowed for a total of $6,046.78. The cost of envelopes for the mailing are not allowed. Class counsel also requests reimbursement of photocopying performed in connection with the notice, but for convenience we will consider that request, together with all of the other shared photocopy costs, below.

### 5. Subpoena fees

■ They have requested $8,342.76. The fees charged by the U.S. District Court for serving subpoenas are allowed. The charges by various trading firms for costs of responding to subpoenas must also be allowed (although we do note that it was rather outrageous of firms to charge up to $1 per page for documents copied). The travel expenses relating to the Whaley deposition are also allowed. The total allowed is $4,474.60. Class counsel also requests reimbursement of photocopying performed in connection with this category, but for convenience we will consider that request, together with all of the other shared photocopy costs, below.

### 6. Expert fees: Goldberg

■ Mr. Goldberg was the computer expert in this case. He did a great deal of programming and data manipulation. He made accessible the voluminous trade. data that was central to this case. His charge was $65.00 per hour, which is reasonable, and his hours, while high, are not out of bounds. The total requested—$221,679.25—is approved.

### 7. Expert fees: Grief

■ Mr. Grief was the plaintiffs' expert on the market and its operations. He worked closely with Mr. Goldberg in sorting out the trade data and with the attorneys in explaining what happened. The contract with Grief provided for $225.00 per day regardless of the number of hours worked. This resulted in a bargain on some days when many hours were worked, and a windfall to Mr. Grief on short days. Class counsel assure us that he worked many hours and that this rate in fact was a bargain. The total requested is $189,621.46, which is approved.

### 8. Expert witness fees: Blin

■ John Blin was plaintiffs' expert witness for trial. It was his theory and testimony that would have been the linchpin of plaintiffs' proof of liability. Without Blin there would have been no case. Although his rate, $400.00 per hour, is high, class counsel have detailed their extensive and nearly fruitless efforts in attempting to get someone expert in this field to testify against an exchange. The total revised request is for $389,429.17. This includes 926 hours of work, for $370,400, $7,336.14 for expenses paid by Blin, and $11,693.03 in expenses paid by class counsel for Blin's travel between Chicago and New York. This expense, $389,429.17, is approved.

### 9. Demonstrative evidence

Upon revision, the items here were relocated elsewhere and there is currently no request in this category.

### 10. Computer support

■ They have requested $9,306.40. We will allow $4,805 for getting data in computer format, use of some rented software and conversion of data formats, but we deny the expenditures for computer equipment and software, as we did with individual expenses above.

### 11. Photocopy

They have requested $11,532.72. This revised request includes $918.80 for external copying. The external receipts include several duplicates, and we find only $176.80 in allowable costs. The in-house copying, including amounts originally split between depositions, subpoenas, class notice, and this category is based on logs of copies made in June–August 1990 and March–April 1992.[7] The total recorded in those receipts is $18,576.27, or 92,881 copies. As we did with individual copy costs, we will allow 46,441 copies for $4,644.10. The total allowed in this category is therefore $4,820.90.

### 12. Printing & binding

This revised request for $1,239.25 is allowed (although it seems to be for copying and binding).

### 13. Books & publications

They have requested a revised total of $911.01, of which $68.80 is allowable. As with individual costs above, we have not allowed for the cost of computer manuals or software or books that are more generally usable to be included in costs chargeable to this case.

### 14. Computerized legal research

They have requested $6,284.02, of which $5,866.14 is documented. As noted above, we would therefore allow $4,399.61. As with the individual cost, we are not allowing for subscription fees, or taxes that are not individually allocated to this case.

---

**7.** Excluding the portion of March 1992 that was requested and paid under the individual photocopy requests.

## C. Additional Case Expenses (petition of 6/9/93)

Beeler, Schad & Diamond have requested an additional $8,025.58 in expenses incurred preceding settlement of this case, which they were not billed for until after they filed their initial petition for fees and costs.

### 1. Computer research

They have requested $1,326.35 for Lexis and $207.48 for Dow Jones News Retrieval. Following the same procedures as above, a total of $941.12 is approved.

### 2. Data tapes

The request for $333.00 is approved.

### 3. Expert fees: computer

 They have requested an additional $6,158.75 for fees paid to Mr. Goldberg for additional computer work. This request is approved for $5,866.25. We have disallowed reimbursement for 4.5 hours on December 2, 1992 because the work described is for general operation of the firm, and is not specific to this case. We quote: "Install WordPerfect and WordPerfect Office programs on IDS computer for use with CBOE case. Demo system for Gene Beeler. Test fax capabilities. Configure IDS computer." Regardless of what case this particular computer was used to work on, law firms are expected to install WordPerfect or their other word processing programs at their own expense, not at clients.

## D. Administrative Expenses (petition of 6/9/93)

Beeler, Schad & Diamond also made expenditures in administering the settlement. They have requested an additional reimbursement of $44,746.79, plus advance payment on anticipated expenditures of $1,550 for a total of $46,296.79.

### 1. Address Searches

 ▪ This request for $10,461.00 is approved. This includes $1,659.00 for obtaining forwarding address information from the US Postmaster, and $8,802.00 for a search firm to track down class members.

### 2. Postage

 They have requested $1,175.68 for postage, of which $1,173.34 is granted. (The petty cash receipt for routine postage was excluded and a transcription error was corrected, leaving the allowed total.)

### 3. Computer programming: Goldberg

They have requested $28,892.50 for 444.5 hours of computer programming. We allow all of this cost except for $32.50 for work relating to a press release (12/23/92). A total of $28,860 is approved.

### 4. Photocopying

We approve the $100.50 requested for outside photocopying. The in-house request totalled $2,457.60, which we reduced, as above, to $614.60. The total allowed is thus $715.10.

### 5. Long distance phone calls

The total requested was $909.50, and we were able to verify and allow $431.65 (excluding mobile phone costs and markups, as discussed above).

### 6. Federal Express

The request for $68.00 is allowed.

### 7. Court hearing transcripts

The $66.00 for a paper transcript is approved, the $35.00 for the disk is denied.

### 8. Lexis

 This request for $325.18 (we believe it is really for $352.18) is not allowed. The administration of the settlement should not have entailed any further legal research—at least nothing so complex that use of Lexis was required.

### 9. Miscellaneous

The requests for fax costs, parking, messenger services, and envelopes are denied for the reasons discussed above.

## E. Additional Administrative Expenses (petition of 7/19/93)

In their petition of June 9, 1993 class counsel requested $1,550.00 for costs projected through June 30, 1993. They have now replaced that request with one for $3,499.00 for costs documented through July 15, 1993

and an additional $1,573.00 for costs projected through July 30, 1993.

### 1. Search fees

They have requested $23.00 for tracking down a class member who moved without a forwarding address. This is allowed.

### 2. Messenger and Federal Express

As above, we will not allow for local messenger deliveries; however, we will reimburse for $121.00 of Federal Express charges.

### 3. Telephone

As above, we will not allow mobile phone calls to be billed to the class; however, we will allow $89.20 in documented long distance costs.

### 4. Computer programming

They have requested an additional $1,088.75 for work done by their computer expert which is allowed.

### 5. Court hearing transcripts

They have requested $620.00, including expedited rates. They did not request permission in advance, as the rules require; thus we will allow only the regular rates, for a total of $393.00.

### 6. Photocopying

They have requested $1,387.00 for in house copying of 6,935 copies. As above we will allow half the copies at $.10/page, or $346.70. They have also requested reimbursement for two petty cash copy jobs. The $3.25 for copying docket sheets is allowed. The $3.15 charge for copying the Judicial Conference chapter on court reporter transcript fees is not allowed. First, it does not relate to case administration but to preparation of the fee petition, which is not chargeable to the class. Second, this court, when requested, gave a free copy of the relevant pages to class counsel. They have no business asking to be paid for making another one. The total allowed in this category is $349.95.

### 7. Fax

As above, these costs will not be allowed.

### 8. Anticipated future costs

As noted above, class counsel have requested $1,573.00 for anticipated future expenses. We will not award any future costs without seeing specific documentation. However, we recognize that there may be legitimate expenses in the future. When documentation of specific expenses can be provided, we will allow up to $1,573.00 from the reserve fund discussed below.

### F. *Summary*

| Firm | Costs |
|---|---|
| Beeler, Schad & Diamond | $39,161.46 |
| Futterman & Howard | $ 4,463.38 |
| Beigel & Sandler | $ 2,217.53 |
| Cohen, Milstein, Hausfeld & Toll | $ 2,026.19 |
| Fishman & Merrick | $ 582.20 |
| Joyce & Kubasiak | $40,568.76 |
| Shared Costs | $862,252.62 |
| Additional Costs | $ 7,140.37 |
| Administrative Costs | $ 41,775.09 |
| Additional Administrative | $ 2,064.90 |
| TOTAL | $1,002,252.50 |

## IV.

## INCENTIVE AWARDS

Plaintiffs have submitted a petition in support of an incentive award of $10,000.00 to each of the three class representatives—Myles M. Spicer, John A. Brittain, and David W. Schut. In considering this petition, we have reviewed the following factors: (1) the actions taken by the class representatives to protect the interests of class members and others; (2) whether those actions resulted in substantial benefit to the class members; and (3) the amount of time and effort spent by the class representatives in pursuing the litigation. We grant these awards for the services provided by these representative plaintiffs in pursuing the claims on behalf of the class. Each representative suffered substantial losses, ranging from $57,000.00 to $102,000.00. These representatives were the only members among 3,000 investors who stepped forward to press this case, and each invested much time and energy to achieve the results obtained.

Each of the three representative plaintiffs provided substantial service for the benefit of the class. They each believed that something very wrong occurred in the OEX pit at CBOE on October 20, 1987. Each com-

plained immediately to CBOE about the prices they had received on their trades and began their own investigations concerning the events of the day. Upon receiving no meaningful response from CBOE, each sought out counsel to pursue the claims that they felt they had against CBOE and the OEX market-makers.

Each representative plaintiff monitored the case by analyzing key pleadings, legal memoranda and our opinions, and providing their reactions to class counsel. As discovery progressed, class counsel discussed with them the information and solicited ideas about additional information to pursue based on inconsistencies and other defects in the information obtained. Each sat for two depositions. Each reviewed voluminous material in preparation for the December 1992 settlement conference. Each was preparing his testimony for trial when the case finally settled.

Each of the class representatives devoted time and effort over the last four and a half years to the development of this case. Spicer assisted in bringing the first suit by providing extensive materials that he had prepared for a related arbitration case, including charts based on historical pricing data to illustrate appropriate prices for his October 20 trades. *See* Aff. of Myles M. Spicer, at 2–3. Brittain obtained CBOE's October 20 Times and Sales Reports and analyzed them for inaccuracies in CBOE's reported trade volumes and prices. He also analyzed these reports to illustrate the impact October 20 trades had upon investors who used traditional options investment strategies. *See* Aff. of John A. Brittain, at 2–4. Schut explained normal options pricing patterns and relationships, provided an introduction to traditional options investment strategies, and explained in a general way CBOE's floor operations. According to class counsel, he provided a common sense explanation of the prices on October 20, which buttressed Brittain's work. He helped class counsel to identify members of the class by explaining the workings and interrelationships of clearing firms and introducing brokerage firms, and by identifying the different types of records ordinarily prepared and retained by each which would help to locate class members. *See* Aff. of David W. Schut, at 2–3.

The Seventh Circuit has recently recognized that, in appropriate cases, class representatives may be entitled to incentive awards. While affirming the district court's denial of an incentive award to the class representative for his "admittedly modest services" in *In Matter of Continental Illinois Securities Litigation,* 962 F.2d 566, 571 (7th Cir.1992), the court nonetheless observed that "[s]ince without a named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses...." Courts have recognized the importance of incentive awards for class representatives in many cases. *See, e.g., Hammond v. Hendrickson,* No. 85 C 9829 (Aspen, J.) (N.D.Ill. Nov. 20, 1992) (court granted representative plaintiff in a securities class action an incentive award in the amount of $5,000.00); *In re Petro–Lewis Broker–Dealer Litigation,* C.A. No. 1–85–cv–172–RLV (N.D.Ga.1990) (court approved award of one half of out-of-pocket losses totalling $150,122.80 in lieu of pro rata share to fifteen class plaintiffs); *Squitieri v. Gould, et al.,* Civ. 89–6832 (E.D.Pa.1991) (order entered Mar. 31, 1991, awarding $17,-500.00 to representative plaintiff); *In re Windmere Securities Litigation,* Civ. 90–0185 (S.D.Fla. April 8, 1992) (court approved incentive awards of $2,500.00 to each representative plaintiff in securities litigation); *In re Dun & Bradstreet Credit Services Customer Litigation,* 130 F.R.D. 366 (S.D.Ohio 1990) (court approved two incentive awards of $55,000.00 and three of $35,000.00 to five representative plaintiffs); *In re SmithKline Beckman Corp. Securities Litigation,* 751 F.Supp. 525 (E.D.Pa.1990) (court approved award of $5,000.00 to each of several representative plaintiffs); *In re First Jersey Securities, Inc. Litigation,* MDL No. 681, 1989 WL 69901 (E.D.Pa. June 23, 1989) (court approved award of $24,000.00 to representative plaintiff); *Golden v. Shulman,* [1988–89 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,060, 1988 WL 144718 (E.D.N.Y.1988) (court approved award of $5,000.00 to repre-

sentative plaintiff in securities class action); *CBS, Inc. v. Paley*, No. 86 Civ 9140 (JMC) (S.D.N.Y.1990) (court approved payment of $15,000.00 to derivative plaintiff who initiated litigation on behalf of company); *Franklin Container Corp. v. International Paper Co.*, No. 77–3204 (E.D.Pa.1987) (court awarded $100,000.00 to each of two named plaintiffs in an antitrust case); *Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27 (E.D.Pa.1985) (court approved an award of $20,000.00 to each of two representative plaintiffs in antitrust case); *In re Ashland Oil Spill Litigation*, Master File No. M–14670 (W.D.Pa.1990) (court approved 45 awards of $2,500.00 each to plaintiffs in class action); *In re Broadview Savings Bank Securities Litigation*, No. C86–3522 (N.D.Ohio 1988) (court approved an award of $10,000.00 to representative plaintiff); *McGuiness v. Parnes*, No. 87–2728–LFO, 1989 WL 29814 (D.D.C.1989) (court approved an award of $1,500.00 to each of representative plaintiffs in securities class action); *Daniel v. Local 705*, No. 74 C 2865 (Moran, J.) (N.D.Ill. Oct. 7, 1987) (court approved an award of $25,000.00 to survivor of lead plaintiff for significant reforms accomplished for pension participants); *Basile v. Merrill Lynch, P.F. & S.*, 640 F.Supp. 697, 702 (S.D.Ohio 1986) (court awarded $948,-000.00 separate cash award for representative plaintiffs and intervening plaintiffs from a $12.6 million settlement fund); *Cruden v. Bank of New York*, [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,471 (S.D.N.Y. 1991) (court approved an award of $7,500.00 to representative plaintiffs).

As noted above, the class representatives in this case made substantial contributions to the development of the case. Because each of the three representative plaintiffs provided valuable services which benefitted the class as a whole, the plaintiffs' petition for an incentive award of $10,000.00 each for named plaintiffs Spicer, Brittain, and Schut is granted.

## V.

### DISTRIBUTION OF THE SETTLEMENT FUND

In response to information received from potential claimants in this case, class counsel attempted to verify all claimants' trades in order to identify precisely the class and the exact amount of each class member's claim. On April 30, 1993, they issued a Notice of Claim Determination to all claimants whose claims they disputed in whole or in part. On May 13, 1993, class counsel issued a Revised Claim Determination Notice to claimants who provided additional information sufficient to justify modifying their original claim determination notice, and to claimants affected by resolving the "limit order" trades. Class counsel additionally modified claim determinations for those claimants who had lagged in providing information that we had directed concerning arbitration awards or settlements attributable to October 20, 1987 OEX rotation trades.

In total, 36 claimants formally objected to their claim determinations, as calculated by class counsel. Written objections and class counsel's responses to those objections were filed with this court in early June 1993. On June 10, 1993, we held a hearing at which we considered all objections. The objections fell into six main categories: (1) late claims; (2) non-October 20, 1987 trades; (3) non-CBOE Matched Trades computer file trades; (4) free trading trades; (5) arbitration offsets; and (6) miscellaneous objections.

In the first category, one claimant objected who failed to submit a claim before the extended bar date. In the second category, five claimants objected, arguing that class counsel disallowed one or more of their trades which occurred on days other than October 20, 1987. In the third category, nine claimants objected that class counsel disallowed one or more of their trades which did not appear in the CBOE Matched Trades computer file of October 20, 1987 OEX trades. In the fourth category, seven claimants objected that class counsel disallowed one or more of their October 20, 1987 trades which occurred during free trading. In the fifth category, eight claimants who earlier recouped through arbitration or settlement part of their losses objected to class counsel's allocation of their arbitration awards or settlements attributable to October 20, 1987 OEX rotation trades. In the last category,

five claimants with six claims objected for miscellaneous reasons. Two claimants objected that class counsel classified trades as "inconclusive". One claimant with two claims expressed confusion and asked for an explanation of the damage calculation. Another claimant objected, arguing that class counsel disallowed limit order trades. Finally, another claimant whose trades were allowed objected because he felt that a greater recovery was in order.

We ruled on all the objections shortly after the hearing. Order, entered June 15, 1993. In our June 15, 1993 order, we ruled on most of the objections and directed class counsel to examine further the complaints of eight objectors. On June 18, 1993, we ruled on these eight objections in our Final Judgment Order. Final Judgment Order, entered June 18, 1993. In our final order, we identified all 521 class members and the amounts of their respective claims. We also calculated the total damage claim for all 521 class members, which amounts to $24,691,297.63. In our final judgment order, we directed that "[t]o determine the amount each Class Member receives, Class Counsel shall calculate the percent each Class Member's claim amount bears to the total damage claim amount, then apply that percentage to the amount of the settlement fund the Court awards the Class." Final Judgment Order, at 3.

At this time, we order that class counsel distribute (after appropriate payments or deductions are made for (1) our total award of attorneys' fees in the amount of $2,900,-000.00; (2) our award of costs in the amount of $1,002,252.50; (3) our reserved funds in the amount of $40,000.00 plus all interest earned after July 1, 1993, (which we anticipate to be approximately $30,792.00) for future contingencies; and (4) our grant of an incentive award to the representative plaintiffs in the total amount of $30,000.00) the remaining settlement fund plus interest earned through July 1, 1993, to the 521 class members in the manner described above. We note that this award to the class members of approximately $6,027,747.50 from the original $10,000,000.00 settlement, plus $141,-136.00 in interest earned through July 1, 1993, for a total of $6,168,883.50, represents approximately 61.68% of the original settlement fund and will compensate class members for approximately 25% of their total losses of $24,691,297.63. This distribution shall be made through class counsel no later than August 30, 1993. Any distributed funds which remain unclaimed by class members by December 1, 1993, shall be added to the reserve fund.

Class counsel shall furnish the court by August 16, 1993, a schedule of the proposed distribution, including the name of each class member and the amount proposed to be distributed to each class member, in accordance with our Final Judgment Order. This proposed schedule of distribution shall also reflect the three incentive awards which we have granted above. An initial report summarizing this distribution shall be filed by class counsel with this court no later than September 13, 1993. A final report summarizing this distribution, including proof of distribution, shall be filed by class counsel with this court as soon as possible and no later than December 17, 1993. Specifically, that final report shall contain, at a minimum, the following: (1) a certification that the settlement fund has been distributed pursuant to the instructions in this opinion and in our Final Judgment Order; (2) proof of distribution of the appropriate amount to each class member (e.g., cancelled checks); (3) identification of the bank account which represents the common fund; and (4) bank account statements for that account covering the time period from the transfer of the settlement fund to the date of the report; (5) identification of the bank account which represents the reserve fund; and (6) bank account statements for that account covering the time period from the creation of the reserve fund to the date of the report.

## VI.

### CONCLUSION

In accordance with the above discussion, we award class counsel additional attorneys' fees in the amount of $1,400,000.00 and additional expenses in the amount of $752,252.50. We also award named plaintiffs Spicer, Brittain, and Schut an incentive award of $10,-000.00 each, for a total incentive award of

$30,000.00. We direct class counsel to establish a reserve fund in the amount of $40,000.00 plus all interest earned after July 1, 1993, for future contingencies. The remaining settlement fund, including all interest earned through July 1, 1993, shall be distributed to the class members in accordance with the procedure articulated in this opinion and in our Final Judgment Order, entered June 18, 1993, no later than August 30, 1993. Class counsel shall furnish the court by August 16, 1993, a schedule of the proposed distribution. An initial report summarizing the distribution of the common fund shall be filed with the court no later than September 13, 1993. A final report summarizing the distribution, including proof of distribution, shall be filed with the court no later than December 17, 1993. The court reserves jurisdiction over all matters relating to the distribution of the common fund.

## ORDER

As described in our Memorandum Opinion of this same date, IT IS HEREBY ORDERED THAT:

(1) Class counsel shall receive an additional award of attorneys' fees in the amount of $1,400,000.00, to be paid out of the common fund created under the settlement agreement approved by this court (the "common fund"), for an aggregate attorneys' fee award of $2,900,000.00, which represents 29% of the settlement of $10,000,000.00;

(2) Class counsel shall receive an additional reimbursement of expenses in the amount of $752,252.50, to be paid out of the common fund, for an aggregate expenses award of $1,002,252.50, which represents approximately 10% of the settlement;

(3) Class representatives Spicer, Brittain, and Schut shall each receive incentive awards of $10,000.00, to be paid out of the common fund;

(4) Class counsel shall establish a reserve fund for future contingencies out of the common fund, in the amount of $40,000.00, plus all interest earned after July 1, 1993; as directed below in paragraph (9), any distributed funds which remain unclaimed by members of the plaintiff class by December 1, 1993, shall be added to the reserve fund;

(5) Class counsel shall furnish the court no later than August 16, 1993, a schedule with the proposed distribution to individual members of the plaintiff class pursuant to our Memorandum Opinion of this date and our Final Judgment Order;

(6) The balance of the common fund, including all interest earned through July 1, 1993, in the amount of approximately $6,168,883.50, shall be distributed no later than August 30, 1993, to authorized members of the plaintiff class, as set forth in the proposed distribution list prepared provided for in paragraph 5; we note that this distribution will compensate the members of the plaintiff class for approximately 25% of their aggregate losses totalling approximately $24,691,297.63;

(7) Class counsel shall file an initial report on the distribution of the common fund no later than September 13, 1993;

(8) Class counsel shall file a final report on the distribution of the common fund no later than December 17, 1993;

(9) Any distributed funds which remain unclaimed by members of the plaintiff class by December 1, 1993, shall be added to the reserve fund; and

(10) LaSalle Northwest and American National Bank are directed to distribute the common fund in accordance with the schedule of distribution to be filed with the court by class counsel as provided in paragraph (5) of this order, plus the additional disbursements to class counsel as provided in paragraphs (1) and (2) of this order.

(11) The court reserves jurisdiction over all matters relating to the distribution of the common fund.